**No. 23-3426**

_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**JOEL MICHAEL RYNO,**

Defendant-Appellant.

_____

Appeal from the
United States District Court
for the District of Alaska
Honorable JOSHUA M. KINDRED
Dist. Ct. Case No. 3:23-cr-00045-JMK-MMS

_____

**APPELLANT'S OPENING BRIEF**

_____

DANIEL POULSON
Assistant Federal Defender
Federal Public Defender for the District of Alaska
Address: 188 W. Northern Lights Blvd., Suite 700
Anchorage, AK 99503
Phone: (907) 646-3400

Attorney for Defendant-Appellant

# TABLE OF CONTENTS

I.  STATEMENT OF JURISDICTION ……..…………….…………….…... 1

II. BAIL STATUS …………………………………….…………..…….. 1

III. QUESTIONS PRESENTED …………………………….………………. 1

IV. SUMMARY OF ARGUMENT ……………………….………………. 1

V.  STANDARD OF REVIEW …………………………….……………..… 6

VI. STATEMENT OF THE CASE ……………………………………… 6

    A. Indictment and factual background …………………….………… 6

    B. District court proceedings ………………………………….…….…. 7

VII. ARGUMENT …………………………………………………...… 8

    A. The historical inquiry required under *Bruen* and *Heller*. …....……...….. 8

        1. *Bruen* overhauled the test for determining whether government action infringes on the right to keep and bear arms. …………………………………………...……..… 8

        2. Under *Bruen*, when a regulation seeks to address a general societal problem that has persisted since the 18th Century, the Government must identify a "distinctly similar" historical regulation…………………………………….…..…....… 12

    B. Persons convicted of domestic violence offenses are among the "people" who have a Second Amendment right to keep and bear arms, which is not limited to "law-abiding, responsible citizens". …..... 14

        1. *Bruen* abrogated prior case law relying on "presumptively lawful" exceptions to the Second Amendment. …………………… 15

        2. The Second Amendment right to keep and bear arms is not limited to "law-abiding, responsible citizens". ………..…..… 19

i

3. Mr. Ryno's conduct is protected by the Second Amendment. …………………………………………….......…… 23

C. There is no American historical tradition prohibiting possession of firearms by persons with misdemeanor domestic violence convictions. ……………………...………………………….... 23

1. Laws such as 18 U.S.C. § 922(g)(9) which prohibit possession of firearms based on an individual's criminal history are a 20th Century invention. …………………………... 24

2. Restricting the right to bear arms based on prior criminal history does not comport with colonial and Founding-era history. ............................................................................. 29

3. There is no historical tradition of disarming "unvirtuous" citizens. ……………………………….……………...…… 32

4. The Government cannot rely on analogical reasoning to compare 18 U.S.C. § 922(g)(9) to early American laws that disarmed "dangerous" groups of people such as enslaved persons, freed Blacks, and Native Americans. ……..…………….... 37

5. The Government cannot rely on analogical reasoning to compare 18 U.S.C. § 922(g)(9) to laws that prohibited possession of firearms by traitors and those who were suspected of disloyalty to the Nation. ……..……………….……... 41

6. The Government cannot establish an historical tradition of permanently disarming persons "dangerous" persons based on a prior history of violence. …………………………….……….. 43

7. Historical laws restricting misuse of firearms in public are not relevantly similar to 18 U.S.C. § 922(g)(9). …………………... 45

D. Numerous courts have struck down federal firearms offenses under *Bruen*, reasoning that there is no historical tradition of permanently disarming persons based on their criminal history. …………………... 48

ii

E.  Section 922(g)(9) is unconstitutional as applied to Mr. Ryno. ……....… 53

VIII.  CONCLUSION …………………………………………………..………. 55

# TABLE OF AUTHORITIES

## CASES

*Binderup v. U.S. Att'y Gen.,*
836 F.3d 336 (3d Cir. 2016) (*en banc*)……..…………………………….... 34

*Borden v. United States,*
593 U.S. 420 (2021) ………………………………………….……… 54

*Chevron U.S.A. Inc. v. Echazabal*,
536 U.S. 73 (2002) …………………………………………..…… 30

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ……………………………………………..… 53

*District of Columbia v. Heller*,
554 U.S. 570, 592 (2008). ……..……………..………………………..... *passim*

*Entler v. Gregoire*,
872 F.3d 1031 (9th Cir. 2017) …………………………………..… 21

*Folajtar v. U.S. Att'y Gen.*,
980 F.3d 897 (3d Cir. 2020) ………..…………………….………… 32,33

*Jennings v. State*,
5 Tex. Ct. App. 298 (1878) …………………………….…..……….43,44

*Kanter v. Barr*,
 919 F.3d 437 (7th Cir. 2019) …………………………….. 29, 30, 32-33

*Legal Aid Services of Oregon v. Legal Services Corp.*,
608 F.3d 1084 (9th Cir. 2010) ……………………………………… 53

*Medina v. Whitaker*,
913 F.3d 152 (D.C. Cir. 2019) …………………………….………. 32-33

*Miller v. Gammie*,
335 F.3d 889  (9th Cir. 2003) (*en banc*) ………………………… 16, 36

iv

*New York Rifle & Pistol Association, Inc., v. Bruen*,
142 S. Ct. 2111 (2022). …………………………………..………..…… *passim*

*N.R.A. v. A.T.F.*,
700 F.3d 185 (5th Cir. 2012) … ……………….……………….…….. 26, 28

*Pena v. Lindley*,
898 F.3d 969 (9th Cir. 2018) …………………………………….…...…. 19

*Range v. Att'y Gen.*,
69 F.4th 96 (3d Cir. 2023) …………….……………….……37, 39, 40, 48, 49,50

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) (*en banc*) ….. …………………….……… 19

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) ……………………………………….……... 6

*United States v. Booker*,
644 F.3d 12 (1st Cir. 2011) ……………………………………… 24-25

*United States v. Bullock*,
--- F.Supp.3d ----, 2023 WL 4232309 …………..……………………….……. 51

*United States v. Castleman*,
572 U.S. 157 (2014) …………………………………………….. 47, 54

*United States v. Chester*,
628 F.3d 673 (4th Cir. 2010) …………………………………......... 17

*United States v. Chovan*,
735 F.3d 1127 (9th Cir. 2013) ……………………………………….…...… 9

*United States v. Christian Echoes Nat'l Ministry, Inc.*,
404 U.S. 561 (1972) …………………………………………………….. 53

*United States v. Combs,*
654 F.Supp.3d 612 (E.D. Ky. Feb. 2, 2023) …………………………… 51

v

*United States v. Connelly*,
668 F.Supp.3d 662 (W.D. Tex. Apr. 6, 2023) ………………….……………. 51

*United States v. Daniels*,
77 F.4th 337 (5th Cir. 2023) …………………………………….……… 48, 53

*United States v. Forbis*,
--- F.Supp.3d ----, 2023 WL 5971142 (N.D. Okla. Aug. 17, 2023) ………... 51

*United States v. Harrison*,
654 F.Supp.3d 1191 (W.D. Okla. Feb. 3, 2023) ………………….………… 51

*United States v. Hayes*,
555 U.S. 415 (2009) …………………………………………………… 26

*United States v. Hicks*,
649 F. Supp. 3d 357 (W.D. Tex. 2023) ………….……………………… 40

*United States v. Lara*,
815 F.3d 605 (9th Cir. 2016) ……………………………………..… 21

*United States v. Leblanc*,
--- F. Supp. 3d ----, 2023 WL 8756694 (M.D. La. Dec. 19, 2023) ……... 51-52

*United States v. Miller*,
307 U.S. 174 (1939) …………………………………………….…… 22

*United States v. Perez-Gallan*,
640 F.Supp.3d 697 (W.D. Tex. Nov. 10, 2022) ………………..…………… 51

*United States v. Phillips*,
827 F.3d 1171 (9th Cir. 2016) …………………………….……..…… 15, 18

*United States v. Prince*,
--- F.Supp.3d ----, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023) …………..…. 52

*United States v. Quailes*,
--- F.Supp.3d ----, 2023 WL 5401733 …………………………………… 51

*United States v. Rahimi*,
61 F.4th 443 (5th Cir. 2023) ………………...………………….7, 40, 48, 49, 52

*United States v. Skoien,*
614 F.3d 638 (7th Cir. 2010) ……………………………………..…… 24, 32

*United States v. Torres*,
789 F. App'x 655 (9th Cir. 2020) ……………………………………….. 19

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) …………………………………………….…. 20

*United States v. Vongxay*,
594 F.3d 1111 (9th Cir. 2010)…………………………………15, 16, 19, 35-36

*United States v. Williams*,
616 F.3d 685 (7th Cir. 2010) ……………………………………….… 26

*Voisine v. United States*,
579 U.S. 686 (2016) ……………………………………………… 47

**STATUTES**

AS § 11.41.230(a)(1)  …………………………………………… 2, 49

18 U.S.C. § 922(g)(9) …………………………………..……..… *passim*

18 U.S.C. § 924(a)(2) …………………………………..…… *passim*

18 U.S.C. § 3231 …………………………….…………………..….. 1

18 U.S.C. § 3742 …………………………………………..…… 1

28 U.S.C. § 1291 ………………………………………………… 1

**RULES**

Fed. R. App. Pro. 4(b) ……………………………………….…..... 1

## HISTORICAL STATUTES

"An Act for Disarming Papists and Reputed Papists,
refusing to take the oaths to the Government," (1756)…………..…………..... 42

George I, stat. 2, c. 13 (1714) ……………………………………………….... 42

1836 Mass. Acts 750, ch. 134, § 16 ……………………………………………. 46

Private and Special Statutes of the Commonwealth of Massachusetts from
1780-1805 (1805) ……………………………………..…………………………. 42

Sec'y of the Commonwealth, Acts and Resolves of Massachusetts
1786–87 (1893) ……………………………………………………………….….. 42

Tenn. Const. art. 6, § 26. (1796) …………………………………………....
39

## SECONDARY SOURCES

Robert H. Churchill, *Gun Regulation, the Police Power, and the
Right to Keep Arms in Early America: The Legal Context of the
Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007) ……….…..26, 41

Clayton E. Cramer, *The Racist Roots of Gun Control*,
4 Kan. J.L. & Pub. Pol'y 17 (1994) ……………………………………...…… 39

Jonathan Elliott, *The Debates in the Several State Conventions of the
Federal Constitution* 328, 335 (2d ed. 1836) …………………………………… 31

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting
Dangerous Persons from Possessing Arms*,
20 Wyo. L. Rev. 249, 260 (2020) ……………………………………………. 32

Don B. Kates, *Handgun Prohibition and the Original Meaning of the
Second Amendment*, 82 Mich. L. Rev. 204 (1983) ………………………..…….. 34

Don B. Kates, Jr., *The Second Amendment: A Dialogue*,
49 Law & Contemp. Probs. 143, 146 (1986) …………………………………..... 36

viii

Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009) …………………………………….... 27

Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) …………………………..… 28

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) ………………………..….... 27, 36

Howard Nemerov, *Four Hundred Years of Gun Control… Why Isn't It Working?* (2008) ………………………………………….....… 39

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995) …………………………………….… 35

Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187 (2015) ……………………………………..… 28

Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.Rev. 1175, 1177 (1989) ……………………………….….. 16

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006) …………………………………..... 31

*Whether the Second Amendment Secures an Individual Right*, 28 Op. O.L.C. 126, 226 (2004) …………………………..……………… 43

Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551 (2009) ……….... 24, 27

## I.    STATEMENT OF JURISDICTION

Appellant-Defendant Joel Ryno appeals his conviction for possession of a firearm by an unauthorized person, in violation of 18 U.S.C. § 922(g)(9).

The district court had jurisdiction under 18 U.S.C. § 3231 and entered the judgment on November 2, 2023. ER 3. Mr. Ryno filed a timely notice of appeal on November 7, 2023 pursuant to Fed. R. App. Pro. 4(b). ER 119. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II.    BAIL STATUS

Mr. Ryno is currently released on bail pending appeal in this case.

## III.    QUESTIONS PRESENTED

1. Whether 18 U.S.C. § 922(g)(9) is facially unconstitutional under the Second Amendment of the U.S. Constitution as construed by the Supreme Court in *New York Rifle & Pistol Association, Inc., v. Bruen*, 597 U.S. 1 (2022)?

2. Whether § 922(g)(9) is unconstitutional as applied to Mr. Ryno, who was disqualified for life from possessing a firearm based on two convictions for misdemeanor assault in the fourth degree?

## IV.    SUMMARY OF ARGUMENT

In its landmark decision *New York Rifle & Pistol Association, Inc., v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court held that regulations controlling conduct

1

which falls within the "plain text" of the Second Amendment are presumptively unconstitutional, and the government must establish their constitutionality based on this Nation's historical tradition of firearm regulation. *Id.* at 2126.

Mr. Ryno pled guilty to one count of possession of a firearm by an unauthorized person, in violation of 18 U.S.C. § 922(g)(9). That offense imposes a lifetime ban on possession of firearms by any person who has been convicted of a misdemeanor crime of domestic violence.

Under the history-and-text standard demanded by *Bruen*, 18 U.S.C. § 922(g)(9) is facially unconstitutional.

First, the Second Amendment's plain text applies to Mr. Ryno and his conduct. Under the Second Amendment, "the people" presumptively have the right to bear arms. *Bruen,* 142 S. Ct. at 2126. The Supreme Court has repeatedly held that this right applies to all persons who are "part of [the] national community." *Dist. of Columbia v. Heller*, 554 U.S. 570, 578-80 (2008). Mr. Ryno is an American citizen and lifelong Alaskan and enjoys the Second Amendment's protections. Nothing in *Bruen* or *Heller* disturbs the conclusion that Mr. Ryno enjoys the freedoms granted to "the people" by the Second Amendment's plain text.

Second, there is no competent evidence that 18 U.S.C. § 922(g)(9) comports with this Nation's history of firearm regulation. Under *Bruen,* when a challenged

firearm regulation addresses a general social problem that has existed since the 18th Century, the absence of "distinctly similar laws" in existence at the time of the Founding is "relevant evidence" that the modern firearm law is unconstitutional. 142 S. Ct. at 2131. However, in the case of modern firearm laws addressing "unprecedented societal concerns" or "dramatic technological changes," courts may engage in analogical reasoning. *Id.* at 2131. When conducting this analogical inquiry, it is not enough that the two laws bear passing resemblance; *Bruen* instructs the reviewing court to consider *how* and *why* the laws burden the right to armed self-defense. *Id.*

The *Bruen* court stressed that this inquiry is "neither a regulatory straightjacket [sic] nor a "regulatory blank check." *Id.* The Government does not need to find an "historical twin," as long as the "features" of the modern firearm law are "relevantly similar" to a "well-established and representative historical analogue." *Id.* at 2133.

In this case, there are no well-represented and representative historical analogues, much less historical twins for 18 U.S.C. § 922(g)(9). There is no evidence that misdemeanants in general suffered any restrictions on their right to possess firearms in 1791 – much less a lifetime prohibition which carried criminal penalties for non-compliance. The few historical examples of legislation regulating possession

3

of firearms by persons convicted of crimes were either never enacted or too attenuated from the signature features of 18 U.S.C. § 922(g)(9) to survive *Bruen's* particularized standard.

Nor should this Court adopt the argument that laws like 18 U.S.C. § 922(g)(9) fall within the same tradition as laws regulating possession of firearms by supposedly "dangerous" or "unvirtuous" persons, such as enslaved persons, Native Americans, British loyalists and religious minorities. In addition to being flagrantly discriminatory and incompatible with the 14th Amendment's equal protection and due process clauses, the ostensible purpose behind these laws was to preserve political and social order, not the protection of private individuals. Moreover, the laws were applicable to persons who were not considered part of the body politic. The handful of laws cited by the district court lack meaningful historical support and are not part of any "enduring American tradition." *Bruen*, 142 S. Ct. at 2154.

Likewise, laws which prohibited bearing arms in a manner that would cause fear among the public are also dissimilar. Unlike those scattered examples, § 922(g)(9) relies on a broad classification scheme, rather than individual conduct. Nor does the modern law require proof that the individual is *presently* dangerous.

The district court's reasoning in the proceedings below is incompatible with the Court's admonition in both *Heller* and *Bruen* that the individual right to bear

arms enjoys the same respect as any other constitutional right. Allowing the government to disarm groups of "dangerous" persons would give the federal government vast and unchecked power to strip any person of their right to bear arms in the name of public safety. *Bruen* emphatically rejected this kind of "regulatory blank check," which would make the Second Amendment a nullity. A classification scheme that disarms any person deemed "dangerous" is too broad and unworkable to survive scrutiny.

Even if the statute survives a facial challenge, the statute is overbroad and unconstitutional as applied to Mr. Ryno and his conduct. Mr. Ryno possessed the firearms involved in this case for purposes of protection of his life and property. He is not alleged to have brandished or discharged the firearms to threaten or intimidate others, or that he possessed them in order to commit other offenses. He was not impaired when the firearms were seized. Mr. Ryno's current history and characteristics do not establish that he poses a current threat to any person or the public generally, or that a lifetime prohibition on his right to bear arms is consistent with this Nation's history of firearm regulation.

Because the United States did not provide competent historical evidence that persons convicted of misdemeanor domestic violence offenses like Mr. Ryno lost

their right to bear arms as a result of their conviction, the instant conviction must be reversed.

## V.    STANDARD OF REVIEW

This Court reviews the constitutionality of a statute *de novo*. *United States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023).

## VI.    STATEMENT OF THE CASE

### A. Indictment and factual background.

On May 17, 2022, Joel Michael Ryno was named in an indictment filed in the U.S. District Court of Alaska charging him with three counts of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(9) and § 924(a)(2). ER 118. Count 1, states that on or about December 16, 2020 Mr. Ryno possessed a .22 caliber Remington rifle and 10 rounds of .22 caliber ammunition. ER 116. Count 2 alleged that on February 24, 2022 Mr. Ryno possessed a 9mm Glock pistol and 9mm ammunition. ER 116. Count 3 alleged that on April 16, 2022 Mr. Ryno possessed a 9mm Glock pistol and a multi-caliber C-9 pistol. ER 117.

Per the indictment, Mr. Ryno's firearm rights were restricted under federal law because he had previously been convicted of two prior misdemeanor domestic violence offenses, to wit: an April 19, 2019 conviction for assault in the fourth degree, in violation of AS 11.41.230(a)(1), imposed by the District Court of Alaska,

Case No. 3PA-17-01151 CR, and a June 15, 2021 conviction for assault in the fourth degree, in violation of AS § 11.41.230(a)(1), imposed by the District Court of Alaska, Case No. 3PA-19-02536 CR. ER 116-117.

### B. District court proceedings.

Mr. Ryno pled not guilty and was appointed counsel. On October 26, 2022, Mr. Ryno moved for dismissal of the indictment. District Court ("D.C.") ECF Doc. 30. In his motion to dismiss, Ryno argued that under the Second Amendment as construed by Bruen, 18 U.S.C. § 922(g)(9) was unconstitutional as applied to his conduct and that the statute was facially unconstitutional. *Id.*

Oral argument was held on the motion on November 30, 2022. ER 70-114. After the parties submitted supplemental briefing regarding the impact of the Fifth Circuit's decision in United States v. Rahimi, 61 F.4th 443 (5th Cir. 2023) the magistrate issued a Final Report and Recommendation on February 22, 2023.

On May 30, 2023 the district court issued an order accepting the Final Report and Recommendation in its entirety. ER 27-40.

Mr. Ryno ultimately pled guilty to Count 1, pursuant to a plea agreement he reached with the Government. Under the terms of the plea agreement, Mr. Ryno preserved his right to appeal the district court's denial of the motion to dismiss. ER 11, see Fed. R. Crim. Pro. 11(a)(2). Imposition of sentence was held on September 22, 2023 and Mr. Ryno was sentenced to 37 months' incarceration, with 3 years'

supervised release. ER 3-9. Mr. Ryno was subsequently released on bail pending

appeal. D.C. Doc. 112.

## VII.   ARGUMENT

### A. The historical inquiry required under *Bruen* and *Heller.*

#### 1. *Bruen* overhauled the test for determining whether government action infringes on the right of the people to keep and bear arms.

The Second Amendment provides, "A well regulated Militia, being necessary

to the security of a free State, the right of the people to keep and bear Arms, shall

not be infringed." U.S. Const. amend. II.

In *District of Columbia v. Heller*, the Supreme Court held the Second

Amendment codified a pre-existing individual right to possess and use firearms for

lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008).

The Court canvassed "the historical background of the Second Amendment,"

including English history from the 1600s through American independence, colonial

law and practice leading up to and immediately following 1791, and evidence of

how the Second Amendment was interpreted in the century after its enactment. *Id.*

at 592-619. Based on this survey, the Court concluded the right protected by the

Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586.

Rather, "the Second Amendment confers an individual right to keep and bear arms"

that "belongs to all Americans." *Id.* at 581, 622. The Court therefore struck down

District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Following *Heller*, federal courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms. *See, United States v. Chovan*, 735 F.3d 1127, 1134–37 (9th Cir. 2013) (discussing cases).

Under this two-step test, the first question was "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* (quotations omitted). This step was satisfied if the law "burden[ed] conduct that was within the scope of the Second Amendment as historically understood." *Id.*

If the law burdened conduct covered by the Second Amendment, courts then "move[d] to the second step of applying an appropriate form of means-end scrutiny." *Id.* The level of scrutiny applied depended on "the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* at 1138 (quotations omitted). This could vary between intermediate and strict scrutiny but required more than rational basis. *See Id.* at 1137 (citing *Heller*, 554 U.S. at 628 n.27). This meant, at minimum, courts always assigned some weight to the

9

government's interest in public safety and "keeping firearms away from those most likely to misuse them." *Id.* at 1139 (quotations omitted).

In *Bruen* the Supreme Court squarely rejected that approach, instructing courts instead, to consider only "constitutional text and history." *Bruen,* 142 S. Ct. at 2128-29. In *Bruen*, the Court considered the constitutionality of New York's "proper cause" licensing scheme for possession of concealed weapons outside the home. *Id.* at 2123. Under the law's "demanding" standard, state officials had broad discretion to withhold a license unless the applicant could establish a "special need for self-protection distinguishable from that of the general community," such as "particular threats, attacks or other extraordinary danger to personal safety." *Id.*

The Court in *Bruen* began by affirming the first step of the analysis: that courts examine "a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification." *Id.* at 2127–28 (quotations omitted). This methodology "center[s] on constitutional text and history." *Id.* at 2128–29. Initially, the court must determine whether the individual's conduct falls within "the Second Amendment's plain text." *Id.* at 2126. If it does, then the conduct is "presumptively" constitutional and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2130, 2126. This inquiry requires an examination of the

10

nation's "well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 2138.

But the *Bruen* Court then declined to conduct the second step, stating that *Heller* did not support "applying means-end scrutiny in the Second Amendment context." *Id.* at 2127. The Court explained that "[t]he Second Amendment is the very product of an interest balancing by the people" and thus "demands our unqualified deference." *Id.* at 2131 (quotations and emphasis omitted). So even if a firearm restriction could satisfy an "interest-balancing inquiry," the "very enumeration of the right takes [it] out of the hands of government." *Id.* at 2129 (quotations omitted). Thus, the "second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Id.* at 2129.

Instead of ratifying the second step of the analysis, the *Bruen* Court considered "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* But the Court reminded that "not all history is created equal." *Id.* at 2131–32. That is because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2136 (quotations omitted). Because the Second Amendment was adopted in 1791, earlier historical evidence "may not illuminate the scope of the

right if linguistic or legal conventions changed in the intervening years." *Id.* Similarly, post-ratification laws that "are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 2137 (quotations and emphasis omitted).

    **2.**  **Under *Bruen*, when a regulation seeks to address a general societal problem that has persisted since the 18th Century, the government must identify a "distinctly similar" historical regulation.**

*Bruen* drew a distinction between two types of regulations. On the one hand, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be relatively straightforward." *Id.* at 2131. Courts should begin by deciding whether "a distinctly similar historical regulation address[ed] the problem." *Id.* If earlier generations did not regulate the problem, or if they regulated it "through materially different means," then the challenged regulation may violate the Second Amendment. *Id.* Likewise, if earlier generations rejected comparable regulations as unconstitutional, "that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

In contrast, if a regulation implicates "unprecedented societal concerns," "dramatic technological changes," or regulations "unimaginable at the founding," the "historical inquiry . . . will often involve reasoning by analogy." *Id.* at 2132. Courts may then ask whether historical regulations and the challenged regulation are

12

"relevantly similar," with special attention to "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

In either case, the burden falls on the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. If the government cannot do so, the infringement cannot survive.

Employing these tools, *Bruen* concluded that New York's law fell under the first category. It implicated a societal problem dating back to the founding: "handgun violence, primarily in urban areas." *Id.* at 2131. Thus, there was no need for analogical reasoning and the government bore the burden to show a "comparable tradition of regulation" from the founding era. *Id.* The government, however, had not "demonstrate[d] a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 2138. At most, the government had shown restrictions on some "dangerous and unusual weapons" and "bearing arms to terrorize the people." *Id.* at 2143. Thus, "no historical basis" contradicted "an otherwise enduring American tradition permitting public carry." *Id.* at 2145, 2154.

As *Bruen* summarized, the "standard for applying the Second Amendment" now requires courts to do the following: If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the Constitution presumptively

protects that conduct." *Id.* at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted.

### B. Persons convicted of domestic violence offenses are among the "people" who have a Second Amendment right to keep and bear arms, which is not limited to "law-abiding, responsible citizens."

In other cases raising challenges to disarmament statutes, the Government has attempted to sidestep the straightforward *Bruen* analysis above by falling back on two passages from *Heller* that supposedly place persons with criminal convictions outside the protection of the Second Amendment. These passages supposedly deem felon-disarmament laws and other status-based disarmament laws "presumptively lawful" because the Second Amendment rights are limited to "law-abiding, responsible citizens."

Neither passage justifies ignoring *Bruen*'s clear command. The first has been superseded by the new *Bruen* framework; the second establishes a constitutional baseline that protects, rather than limits, Second Amendment rights. These passages cannot save § 922(g)(9).

14

### 1. *Bruen* abrogated prior case law relying on "presumptively lawful" exceptions to the Second Amendment.

*Heller* upheld an individual right to keep and bear arms under the Second Amendment but cautioned that this right is "not unlimited." 554 U.S. at 626. As an example, the Court explained that nothing in its decision called into question a non-exhaustive list of "presumptively lawful regulatory measures"—i.e., ones that had *not* yet undergone a full historical analysis. *Id.* at 627 n.26.

This list included supposedly "longstanding" prohibitions on possession of firearms by felons and the mentally ill, and the carrying of firearms in "sensitive places." *Id.* at 626. In *United States v. Vongxay*, a post-*Heller* decision considering the constitutionality of 18 U.S.C. § 922(g)(1), this Court rejected the defendant's argument that *Heller*'s list of "presumptively valid" exceptions was "not binding," and instead deferred to prior precedent upholding "the very type of gun possession restriction that [*Heller*] deemed 'presumptively lawful.'" *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016) (confirming that *Vongxay* was "[b]ased on this language" from *Heller*).

Citing this post-*Heller* precedent, the Government may rely on *Heller's* list of "presumptively valid" regulatory measures to broadly assert that any law regulating possession of firearms by felons or persons convicted of misdemeanor criminal

15

offenses is immune from Second Amendment challenge. But this reading of post-*Heller* precedent is incompatible with *Bruen,* which has repudiated any reliance on *Heller*'s list of "presumptively lawful" exceptions to uphold felon disarmament statutes and derivative laws like 18 U.S.C. § 922(g)(9).

"[W]here intervening Supreme Court authority is clearly irreconcilable" with prior Ninth Circuit authority, "district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (*en banc*).

To determine whether a prior opinion was overruled, courts look not only to "'the holdings of higher courts' decisions'" but also their "'mode of analysis.'" *Id.* (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.Rev. 1175, 1177 (1989)). Such holdings "need not be identical in order to be controlling" so long as they "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id.*

*Vongxay* relied on a line of cases upholding felon disarmament laws under means-end scrutiny. *Id.* at 1116–18. *Bruen* has abolished any reliance on means-end scrutiny and is therefore incompatible with this reading of *Heller*. *Vongxay* is therefore no longer good law. *See Miller*, 335 F.3d at 900.

16

*Bruen* is also clearly irreconcilable with prior precedent holding that *Heller*'s list of "presumptively lawful" firearms restrictions automatically controls absent a full historical analysis. Among the examples of regulations characterized by *Heller* as presumptively valid, the Court included "prohibitions on carrying concealed weapons," which "the majority of the 19th-century courts" had held were "lawful under the Second Amendment or state analogues." *Id.* Elsewhere, *Heller* noted multiple state Supreme Court decisions which held that the "constitutional guarantee of the right to 'bear' arms did not prohibit the banning of concealed weapons." *Id.* at 613, 629.

But *Heller* emphasized that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* And since *Heller* was the Court's "first in-depth examination of the Second Amendment," it could not "clarify the entire field." *Id.* at 635. But *Heller* promised that there would be "time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.; see also United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) ("*Heller* described its exemplary list of 'longstanding prohibitions' as 'presumptively lawful regulatory measures' without alluding to any historical evidence that the right to keep and bear arms did not extend to felons.").

17

*Bruen,* however, did undertake an "exhaustive historical analysis" of a state licensing regime regulating both open and concealed carrying of firearms. While acknowledging *Heller*'s preliminary analysis of concealed-carry laws, *Bruen* then conducted a full historical review and reached a more nuanced understanding of the history surrounding such laws. *See Id.* at 2146–47. With this new understanding, it held that New York could not, in fact, issue a blanket prohibition on concealed carry or even limit it to those with special self-defense needs. *Id.* at 2156.

Importantly, *Bruen* did not "overrule" *Heller*'s "holding" that concealed-carry laws were presumptively lawful. It merely did what *Heller* promised: conducted an "exhaustive historical analysis" on one of the "exceptions" that had now "come before it." *Heller*, 554 U.S. at 635. *Bruen*'s mode of analysis thus shows that *Heller*'s preliminary list of Second Amendment exceptions are not binding, nor does it prevent courts from conducting a full historical review which leads to a different conclusion. So as with the New York statute, the application of *Bruen*'s revamped test—rather than *Heller*'s preliminary take—controls.

Even before *Bruen*, numerous judges in this Circuit noted that there were "good reasons to be skeptical" that any "longstanding prohibition" prevented felons from having guns. *Phillips*, 827 F.3d at 1174; *see also Id.* at n.2 (discussing sources that found "little to no historical justification for the practice"). Some judges have

18

also doubted *Vongxa*y's holding that *Heller*'s language "categorically barred" challenges to felon-in-possession laws. *United States v. Torres*, 789 F. App'x 655, 657 (9th Cir. 2020) (Lee, J., concurring). *See also Pena v. Lindley*, 898 F.3d 969, 1006 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part) (stating that Heller's "presumptively lawful" language "must be a presumption that is subject to rebuttal"); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 692 (9th Cir. 2017) (*en banc*) (Tallman, J., concurring in part and dissenting in part) (reading *Heller*'s list of "presumptively lawful" exceptions as being "subject to rebuttal").

*Bruen* now confirms what these judges suspected: like the concealed-carry laws that *Bruen* later held unconstitutional, a full historical analysis can rebut *Heller*'s "presumptively lawful" exceptions to the Second Amendment.

### 2. The Second Amendment right to keep and bear arms is not limited to "law-abiding, responsible citizens."

In *Heller*, the Court remarked that the Second Amendment was the product of an interest balancing by the Framers. In rejecting the interest-balancing inquiry proposed by the dissenting Justices, the *Heller* majority explained that courts lack authority to "decide on a case-by-case basis whether the right is *really worth* insisting upon." 554 U.S. at 634 (emphasis in original). And regardless, the Court wrote, "*whatever else* [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use

19

arms in defense of hearth and home." *Id.* at 635 (emphasis added). Based on this language, the Government has argued elsewhere that only "law-abiding, responsible citizens" enjoy the right to keep and bear arms. But nothing in the plain text of the Second Amendment draws a distinction between persons convicted of crimes and "the people," and the Government's contrary argument misreads *Heller*'s holding.

As construed by *Heller*, the Second Amendment codifies the preexisting right of "the people" to keep and bear arms. The phrase "the people" is a "term of art" that "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller*, 554 U.S. at 580–81 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).

This reading complies with the way "the people" are defined for purposes of other constitutional rights. Both *Heller* and *Bruen* linked "the people" in the Second Amendment with "the people" in the First Amendment, the Fourth Amendment, the Ninth and Tenth Amendments.[1] It is highly unusual to interpret these constitutional

---

[1] *Heller* noted the similarities between the Second Amendment and the First and Fourth Amendments, implying that the phrase "the people" (which occurs in all three) has the same meaning in all three provisions. *See Heller*, 554 U.S. at 592 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right."); *id.* at 580 (noting that "the people" is "a term of art employed in select parts of the Constitution," including the

20

rights as inherently inapplicable to certain classes of people. For example, we do not assume that convicted felons are excluded from the First Amendment's protections by virtue of their status as convicted felons. *See, e.g., Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017). Nor does the Fourth Amendment make an exception for felons, who are among "the people" whose "persons, houses, paper and effects" enjoy Fourth Amendment protection. *See, e.g., United States v. Lara*, 815 F.3d 605 (9th Cir. 2016).

The phrase "the people" creates "a strong presumption that the Second Amendment right is exercised individually and belongs to *all* Americans." *Id.* Further, "the people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.

*Heller* did not purport to limit the Second Amendment's reach to law-abiding, responsible citizens. Rather, it held that, *at the very least*, such people are protected by the Second Amendment. The passage quoted above makes it clear that the Court's reference to "law-abiding, responsible citizens" was meant to establish a floor, not a

—————————————————

First, Second, Fourth, Ninth, and Tenth Amendments) (quoting *Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)).

21

ceiling. The Court did not have occasion to address whether criminal history is relevant when construing the full scope of the protected right.[2]

If there was any ambiguity, *Bruen* clarifies that this passage does not delineate the scope of the Second Amendment. Although *Heller* reasoned that the Second Amendment protected the right of law-abiding persons to use arms in defense of "hearth and home," *Bruen* held that the Second Amendment's protections *do* extend outside the home. And the insistence throughout *Bruen* that the government bears the burden of proving any regulation as consistent with this Nation's historical traditions commands that the government prove its case not by dicta but by actual evidence. And as explained below, the historical record provides no support whatsoever for laws disarming persons convicted of misdemeanor domestic violence offenses.

_____

[2] *Heller* also used the word "law-abiding" when discussing *United States v. Miller*, 307 U.S. 174 (1939). The *Heller* Court stated that it would "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625. This citation to *Miller* was clearly in reference to the types of weapons (i.e., "arms") that are eligible for Second Amendment protection, rather than the "people" whose conduct is protected. *Id.* at 622 (explaining *Miller* did not turn on whether "the Second Amendment protects only those serving in the militia," but rather on "the character of the weapon" at issue in that case). *Heller*'s use of the term "law-abiding," therefore, provides no support for the view that any group of people are unentitled to the Second Amendment's protection.

22

This Court should decline to read into *Bruen* and *Heller* a qualification that the Second Amendment belongs only to individuals who have not been accused of violating the law. Mr. Ryno may claim a protected Second Amendment right, and 18 U.S.C. § 922(g)(1) must survive scrutiny under *Bruen*.

### 3. Mr. Ryno's conduct is protected by the Second Amendment.

In both *Heller* and *Bruen*, the Court held that Second Amendment scrutiny is triggered so long as the litigant can establish that their *conduct* is encompassed by the Second Amendment's text. *Bruen*, 142 S. Ct. at 2129-30, *Heller*, 554 U.S. at 592

Here, Mr. Ryno's conduct – his possession of a firearm in defense of life and property – is plainly covered by the scope of the Second Amendment as it was understood when the Bill of Rights was ratified. The Supreme Court has explicitly held that the Second Amendment confers an "individual right to possess and carry weapons." *Heller,* 554 U.S. at 592. The core of this guarantee is the right to keep and bear arms for defense of self, family and home, as well as hunting. *Id.* ("Americans valued the ancient right . . . for self-defense and hunting."). Thus, Mr. Ryno's conduct is covered by the Second Amendment's plain text.

### C. The provisions of 18 U.S.C. § 922(g)(9) are facially unconstitutional as there is no American historical tradition prohibiting possession of firearms by persons with misdemeanor domestic violence convictions.

As in *Bruen,* the "general societal problem" that § 922(g)(9) is intended to address – access to firearms by perpetrators of domestic violence – is one that has

persisted since the 18th Century. The law is therefore unconstitutional unless the Government can establish a robust tradition of "distinctly similar historical regulation." This means the government must prove (1) a well-established tradition, (2) present at the Founding, (3) embodied in enacted regulations, and (4) sharing the appropriate degree of similarity to the challenged law.

However, the Government did not carry its burden in the proceedings below, as there are no examples of laws permanently disarming citizens based on criminal history prior to the 20th Century. *See, e.g.*, Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009).

### 1. Laws such as 18 U.S.C. § 922(g)(9) which prohibit possession of firearms based on an individual's criminal history are a 20th Century invention.

The origin of 18 U.S.C. § 922(g)(9) can be traced to the 1938 National Firearms Act, which prohibited possession of firearms by persons convicted of certain felonies such as murder, rape, kidnapping, and burglary, *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It was not until 1961 that Congress amended the statute to prohibit "possession by all felons." *United States v. Skoien,* 614 F.3d 638, 640 (7th Cir. 2010) (citing Pub. L. 87–342, 75 Stat. 757). Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.* In 1996, Congress extended the prohibition to include persons convicted of "a misdemeanor crime of domestic violence" by

24

enacting 18 U.S.C. § 922(g)(9) as a supplement to the 1968 Gun Control Act. Thus § 922(g)(9) "is firmly rooted in the twentieth century," *Booker*, 644 F.3d at 24—a century and a half after adoption of the Second Amendment.

Like the felon disarmament laws which it was modeled after, 18 U.S.C. § 922(g)(9) does not differentiate between the seriousness of the individual's underlying conduct or the nature of their prior conviction. It makes no difference whether the individual was convicted of an offense involving a firearm, or how remote in time the prior conviction was imposed.

Under the present law, an individual's right to bear arms is permanently extinguished, regardless of the passage of time, the individual's demonstrated rehabilitation, or their willingness to abide by restrictions on their use and possession of firearms. Rather, the statute relies on a categorical approach in which *any* domestic violence misdemeanor conviction results in a lifetime prohibition on the individual's fundamental right to keep and bear arms, even if the firearm is kept in the home, and even where the individual can assert a need to keep a firearm for purposes of self-defense and/or defense of one's home. Regulations that impose lifetime firearm restrictions based on prior criminal history are not rooted in a historical tradition unless they "confirm[]" earlier practice. *Bruen*, 142 S. Ct. at 2137. But the evidence is overwhelming that laws like 18 U.S.C. § 922(g)(9) which

impose a permanent ban on the firearm rights of individuals based on prior criminal history are of recent vintage and have no relevantly similar historical analogue.

In fact, prior to *Bruen*, circuit courts asked to consider whether § 922(g)(9) complied with the Second Amendment readily acknowledged that its prohibitions were not rooted in this nation's history of firearm regulations, insofar as its provisions were enacted in 1996. *See United States v. Hayes,* 555 U.S. 415 (2009) (discussing its genesis). Numerous circuit courts have held that there is inconclusive evidence that felons – much less misdemeanants – were barred from possessing firearms at the time of the founding. *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("The academic writing on the subject of whether felons were excluded from firearm possession at the time of the founding is "inconclusive at best." (citation omitted))

Even if the Court broadens its focus to consider state statutes as well, § 922(g)(9) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012).

In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The*

26

*Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142.

Carlton Larson, a professor at the University of California-Davis School of Law, has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009).

It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; see also Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons

27

possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control,* 92 Wash. U. L. Rev. 1187, 1211 (2015) ("[P]rohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War."); *accord N.R.A.*, 700 F.3d at 197 ("[A] strictly originalist argument for . . . bans on firearm possession by felons . . . is difficult to make.").

In short, there was no "historical tradition," circa 1791, of gun regulations even remotely similar to § 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31.

The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by perpetrators of domestic violence. *Id.* at 2131. But they declined to do so, and that inaction indicates § 922(g)(1) "[i]s unconstitutional." *Id.*

//

//

28

### 2. Restricting the right to bear arms based on prior criminal history does not comport with colonial and Founding-era history.

Academics and jurists agree that if one seeks even debatable "authority before World War I for disabling felons from keeping firearms, . . . one is reduced to three proposals emerging from the ratification of the Constitution." *Kanter v. Barr,* 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J. dissenting) (quoting Marshall, *supra*, at 712). Three states—Pennsylvania, Massachusetts, and New Hampshire—proposed versions of the Second Amendment that seemed to carve out an exception for regulating gun possession by certain people.

For example, antifederalists from Pennsylvania proposed wording of the Second Amendment which specified that "no law shall be passed for disarming the people or any of them*, unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 35 (emphasis added). Samuel Adams proposed for the Massachusetts state convention's ratification of the federal Constitution that a Bill of Rights include the following: "…the said Constitution be never construed to authorize Congress to infringe the just liberty of the press, or the rights of the conscience; or to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." *Id.* at 37 (emphasis added). These proposals, if relevant at all, do not demonstrate a historical tradition of regulation akin to § 922(g).

29

As an initial matter, the proposals are an exceptionally weak form of evidence. None made it into the final text. And as *Heller* warns, "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." *Heller*, 554 U.S. at 590; *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) (explaining *expressio unius est exclusio alterius*). Furthermore, *Heller* specifically admonished that "the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress"—is a "dubious" source for Second Amendment interpretation. *Heller*, 554 U.S. at 604. That is because the Second Amendment was "widely understood to codify a pre-existing right, rather than to fashion a new one." *Id.* If these proposals really codified previous practice, the government should be able to point to Founding-era laws imposing similar firearms restrictions. Yet no such laws exist.[3]

---

[3] These proposals contradict early American practice. For example, New Hampshire's "actual rebellion" limitation, *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting), contradicts Massachusetts' promise to store and return the firearms of the instigators of Shays' Rebellion after three years. Nor can Samuel Adams and the Pennsylvania minority's proposal to limit arms to the "peaceable" be squared with early American surety laws that permitted the people "reasonably likely to 'breach the peace'" to still carry guns if they could (1) "prove a special need for self-defense" or (2) "post a bond before publicly carrying a firearm." *Bruen*, 142 S. Ct. at 2148.

There is another issue with relying on these proposals: They differ significantly from one another and from other proposals arising from state conventions. The conventions in Rhode Island and New York proposed an unqualified version of the Second Amendment right, "[t]hat the people have a right to keep and bear arms[.]" 1 Jonathan Elliott, *The Debates in the Several State Conventions of the Federal Constitution* 328, 335 (2d ed. 1836).

Thus, while three proto-Second-Amendment proposals expressly limited who had the right to bear arms, two did not. Nor did the four state constitutions— including those of Pennsylvania and Massachusetts—that adopted a parallel right to arms before the Second Amendment contain any textual limitation on that right. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006).

Relying on this drafting history would therefore suggest that "different people of the founding period had vastly different conceptions of the right to keep and bear arms. That simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties." *Heller*, 554 U.S. at 604–05.

Yet even if one assumes that the proposed limitations shed light on the actual Second Amendment's meaning, it does not legitimize § 922(g)(1). The former

proposed some restrictions on arms for those who engaged in rebellion or violence.[4] The latter bars firearm possession for anyone convicted of a misdemeanor that involves domestic violence. Those are not close to analogous. *See* Marshall, *supra*, at 713 (concluding that "these three formulations do not support a lifetime ban on any 'felon' possessing any arms"); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020); Larson, *supra*, at 1375 (same); *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (same); *Folajtar v. U.S. Att'y Gen.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) (same); *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) (same).

### 3.  There is no historical tradition of disarming "unvirtuous" citizens.

The United States may attempt to argue that 18 U.S.C. § 922(g)(9) is supported by the historical tradition of disarming "unvirtuous citizens," insofar as the right to bear arms was historically understood as requiring a well-regulated militia who could be expected to use firearms responsibly for the good of the nation. *See, e.g., Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (holding that the

---

[4] Given founding-era practice, the Pennsylvanian antifederalists' proposal cannot seriously be read to suggest that anyone convicted of *any* offense lacks a right to bear arms. *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (noting that "no one even today reads this provision to support the disarmament of literally all criminals, even nonviolent misdemeanants").

government may bar the unvirtuous from exercising their Second Amendment rights). Such argument lacks historical support and is incompatible with modern constitutional doctrine. *Kanter*, 919 F.3d at 453–64 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 912, 916–21 (Bibas, J., dissenting).

First, there is no primary source evidence linking the arms right to a person's virtuousness. Some historians have cited one another to support the "virtue" theory, but they have not identified any supporting founding-era materials beyond the three proposals from state conventions discussed above. *Folajtar*, 980 F.3d at 916 (Bibas, J., dissenting) (comparing the authorities supporting a virtuousness limitation to a "matryoshka doll").

Even among academics the theory's merits are far from settled, and scholars disagree about its legitimacy. *Greenlee*, *supra* at 275. "No court nor any source a court has cited has provided any founding-era law disarming 'unvirtuous' citizens." *Id.* at 282.

To the extent that history suggests that the Framers stripped the unvirtuous of certain rights, it was civic rights (such as jury service or voting), not individual rights (such as the freedom of speech). *Folajtar*, 980 F.3d at 916 (Bibas, J., dissenting); *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting).

33

Second and more problematically, the "virtuous citizen" theory rests on the premise that firearm rights were historically limited to those who could serve on the militia. The "virtuous citizen" theory can be traced to a 1983 law review article by Don Kates, an attorney in private practice, who opined that "the ideal of republican virtue was the armed freeholder, upstanding, scrupulously honest, self-reliant and independent—defender of his family, home and property, and joined with his fellow citizens in the militia for the defense of their polity." *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983).

This collectivist reading of the Second Amendment – one that would limit its application to "virtuous" citizens – is incompatible with *Heller*. As several Third Circuit judges noted:

> [T]his virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre-*Heller* interpretations of the Second Amendment by [scholars] . . . who rejected the view that the Amendment confers an individual right and instead characterized the right as a "civic right . . . exercised by citizens, not individuals . . . who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia."

*Binderup v. U.S. Att'y Gen.,* 836 F.3d 336, 368 (3d Cir. 2016) (*en banc*) (Hardiman, J., concurring).

34

In *Vongxay*, this Court relied on the "virtuous citizen" theory to uphold the constitutionality of 18 U.S.C. § 922(g)(1). *United States v. Vongxay* 594 F.3d 1111, 1118 (9th Cir. 2010).

As previously explained, *Vongxay* is not binding on this panel, because its reliance on *Heller*'s list of "presumptively lawful" firearm regulations is incompatible with the holding of *Bruen*. But *Vongxay* is doubly irrelevant because it made no attempt to engage in the constitutional text and cited no examples of historical firearm regulations.

*Bruen* held that "only" text and history can validate a gun law. *Vongxay* conducted no textual analysis, and it provides no citations to actual examples of historical gun laws. The only example of a felon disarmament law cited in *Vongxay* is a passing reference to a contemporary prohibition on felons in Washington, D.C.'s militia. 594 F.3d at 1118. The remainder of the decision rests on the "virtuous citizen" theory to uphold felon disarmament laws. But the citations offered in support of this theory consist of revisionist law review articles which derived the virtuous citizen theory from principles of "classical republican political philosophy." Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986), Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995). These sources are not competent

35

evidence under *Bruen*. Indeed, *Vongxay* itself acknowledges that the historical question "has not been definitively resolved." 594 F.3d at 1118 (citing Marshall, *supra*, 32 Harv. J.L. & Pub. Pol'y at 714–28 (maintaining that bans on felon gun possession are neither long-standing nor supported by common law in the founding era).

This is a problem, because under *Bruen* the constitutionality of a modern firearm regulation depends on the existence of well-established historical corollary, and not simply an outlier that our ancestors would never have accepted. *Bruen*, 142 S. Ct. at 2133.

Applying that standard, if the relevant historical question "has not been definitively resolved," as *Vongxay* admits, the Government has not carried its burden. Certainly, no federal court decision applying *Bruen* today would uphold a modern firearm law based on an ambiguous historical record. Because its "reasoning" and "mode of analysis," *see Miller*, 335 F.3d at 900, is incompatible with *Bruen,* the holding of *Vongxay* is not binding in the present appeal.

In sum, the Founding generation would not have recognized a "virtuous citizen" limitation on the right to bear arms. The text of the Second Amendment is instructive. That the framers recognized an unqualified right to bear arms by "the

36

people" is compelling evidence such limits on firearm possession are not baked into the Second Amendment.

### 4. The Government cannot rely on analogical reasoning to compare 18 U.S.C. § 922(g)(9) to early American laws that disarmed "dangerous" groups of people such as enslaved persons, freed Blacks, and Native Americans.

Where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical "inquiry will be fairly straightforward." *Bruen*, 142 S. Ct. at 2131. In cases challenging regulations that attempt to address longstanding problems, the regulations must be "distinctly similar" to a historical analogue. *Range v. Att'y Gen.*, 69 F.4th 96, 103 (3d Cir. 2023) (quoting *Bruen*, 142 S.Ct. at 2131). If the Founders themselves could have adopted a particular regulation to confront a problem that existed in 1791, but did not do so, or addressed it "through materially different means," that would be relevant evidence that the regulation is inconsistent with the Second Amendment. *Bruen*, 142 S.Ct. at 2131.

On the other hand, in the case of modern firearm laws addressing "unprecedented societal concerns" or "dramatic technological changes," reviewing courts may engage in analogical reasoning. *Id.* at 2131. Specifically, "'modern regulations that were unimaginable at the founding' need only be 'relevantly similar' to historical laws." *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S.Ct. at 2132).

37

Whether the analogue is "relevantly similar" is "judged by 'at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense.'" *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 142 S.Ct. at 2132–33).

The potential danger posed by domestic violence perpetrators gaining access to firearms would have been neither "unprecedented" nor "unimaginable" to the Founders. A societal problem is not "unprecedented" just because society's opinion of the *severity* of the problem has evolved. For example, the regulation in *Bruen* addressed the problem of "handgun violence," primarily in "urban areas." 142 S.Ct. at 2131 (simplified). The "degrees and types of risks" arising from that problem have evolved since the Founding as a consequence of various unprecedented developments such as growing populations, urbanization, and technology. *Id.* at 2180 (Breyer, J., dissenting). Yet that distinction was meaningless to the Court's inquiry, which insisted that that the state of New York provide examples of laws which were distinctly similar to New York's licensing scheme.

In the proceedings below, the Government compared § 922(g)(9) to laws existing during the early years of the American republic which disarmed groups of people considered to be "dangerous," such as enslaved persons, freed Blacks and Native Americans. This analogy is too broad and veers from *Bruen*'s express holding.

38

Various 17th, 18th, and 19th century statutes criminalized the selling or trading of weapons to Indians. *See, e.g.*, Howard Nemerov, *Four Hundred Years of Gun Control…Why Isn't It Working?* 2 (2008). There are also examples of early gun control laws that were concerned with disarming Black people, both enslaved and free. *See*, Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 Kan. J.L. & Pub. Pol'y 17 (1994). For example, a Virginia law from 1640 provided that all persons "except negroes" shall be provided with arms and ammunition or be fined at pleasure of the Governor and Council. *Id.* at 4. Black disarmament laws increased especially after Nat Turner's Rebellion of 1831, and by 1834, gun bans for Black people began appearing in state constitutions. *Id.* at 5-6. *See, e.g.*, Tenn. Const. art. 6, § 26. (1796) ("that the free white men of this State have the right to keep and bear arms…").

Drawing a parallel between today's modern firearm laws and these kinds of racial classifications rests on the tenuous reasoning that *any* law disarming groups of supposedly "dangerous" persons are constitutional. "That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that [persons like Mr. Ryno are] part of a similar group today." *Range*, 69 F.4th at 105.

And such disparate historical examples are fundamentally different than today's modern firearms laws because they were motivated by completely different

purposes. The purpose of laws disarming "disloyal" or "unacceptable" groups "was ostensibly the preservation of political and social order, not the protection of an identified person from the threat of 'domestic gun abuse' posed by another individual." *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023) (citation omitted). Obviously, racist fears of armed uprising against government oppression are far-removed from the kinds of public safety justifications used to support modern firearm laws.

Furthermore, these discriminatory restrictions would be unconstitutional today under the Fourteenth Amendment, *Range*, 69 F.4th at 104, so they are not part of any "enduring American tradition." *Bruen*, 142 S.Ct. at 2154; *see also United States v. Hicks*, 649 F. Supp. 3d 357 (W.D. Tex. 2023), *appeal filed*, No. 23-50030 (5th Cir. 2023) (rejecting government's analogies to laws disarming non-law-abiding, unvirtuous, or dangerous as "slippery slope," and rejecting government's reliance on "historical travesties," including disarmament based on race, class, and religion).

More importantly, these laws do not reflect the scope of the Second Amendment, because these groups were not considered among "the people" whom the Second Amendment protected. Because such laws applied to persons who were

40

not considered a part of the political community, the district court was wrong to rely on them as historical antecedents to a modern firearm law like 18 U.S.C. § 922(g)(9).

   **5.  The Government cannot rely on analogical reasoning to compare 18 U.S.C. § 922(g)(9) to laws that prohibited possession of firearms by traitors and those who were suspected of disloyalty to the Nation.**

Many of the firearm laws enacted around the time of the Founding and ratification of the Second Amendment were in response to the fear of people rebelling against American colonists or committing treason in support of the British.

Certain people, such as British loyalists or those who refused to take oaths swearing allegiance to their state, were regarded as "dangerous" and thus were stripped of certain civic rights, including their right to possess firearms, for fear of their rebellion against the newly founded United States.

To the extent that the new Nation sought to disarm classes of people, the regulatory approach was a far cry from § 922(g)(9).

For example, the Virginia colony, like England, disarmed Catholics, still viewed as traitors to the crown, who would not "swear an oath abjuring the ecclesiastical authority of the Pope." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) (citation omitted).

41

But there was an exception for weapons allowed by a justice of the peace "for the defense of his house and person." George I, stat. 2, c. 13 (1714); and "An Act for Disarming Papists and Reputed Papists, refusing to take the oaths to the Government," (1756), Hening, Statutes at Large, 7:35. In 1787, after Massachusetts suffered an armed uprising known as Shays' Rebellion, the state passed a law prohibiting individuals "who have been or may be guilty of Treason, or giving Aid or Support to the present Rebellion," from possessing arms. 1 Private and Special Statutes of the Commonwealth of Massachusetts from 1780-1805, 145-48 (1805). However, this prohibition only lasted for three years. Id. Massachusetts law required the Commonwealth to hold and then return the rebels' arms after that period. Sec'y of the Commonwealth, Acts and Resolves of Massachusetts 1786–87, at 178 (1893).

In other words, persons involved in one of the most serious violent crimes—armed rebellion—suffered a three-year firearm ban and promise to return the weapons used to attack the new government. This is radically different from a categorical, lifetime ban on possession of all firearms.

And as *Bruen* teaches us, where earlier generations regulated a societal problem through "materially different means," such evidence supports the conclusion that the modern firearm regulation violates the Second Amendment. 142 S. Ct. at 2131.

### 6. The Government cannot establish an historical tradition of permanently disarming "dangerous" persons based on a prior history of violence.

Finally, colonial and Founding-era practice also suggests that committing a serious crime did not result in a permanent disarmament.

At various times, the United States regulated—but did not ban—firearm possession by those feared to be violent. *See Bruen*, 142 U.S. at 2148 (holding that 19th century surety laws allowed people likely to breach the peace to still keep guns for self-defense or if they posted a bond).

But such laws are materially dissimilar from § 922(g)(9). There is no evidence of a precursor to § 922(g)(9)'s broad, class-based ban. In fact, there are at least two documented instances where attempts to disarm a class of offenders was rejected as inconsistent with the right to bear arms.

First, as with Shays' Rebellion, Congress declined to disarm southerners who fought against the Union in the Civil War. Whether the Second Amendment Secures an Individual Right, 28 Op. O.L.C. 126, 226 (2004). The reason was that some northern and Republican senators feared that doing so "would violate the Second Amendment." *Id.*

Second, when a Texas law ordered that people convicted of unlawfully using a pistol be disarmed, it was struck down as unconstitutional. *Jennings v. State*, 5 Tex.

Ct. App. 298, 298 (1878). The Texas Court of Appeals—then the state's highest court for criminal cases—held:

> The Legislature has the power by law to regulate the wearing of arms, with a view to prevent crime, but it has not the power to enact a law the violation of which will work a forfeiture of defendant's arms. While it has the power to regulate the wearing of arms, it has not the power by legislation to take a citizen's arms away from him. One of his most sacred rights is that of having arms for his own defence and that of the State. This right is one of the surest safeguards of liberty and self-preservation.

*Id.* at 300–01.

Although *Jennings* interpreted Texas's constitution, not the Second Amendment, its analysis is indicative of how firmly states believed that everyone had a fundamental, preexisting right to own firearms for self-defense—even those who had misused firearms in the past. *Jennings*' setting is notable. As *Bruen* held, 1870s Texas otherwise imposed unusually strict firearms regulations. 142 S. Ct. at 2153.

In sum, the 19th century history provides clear evidence that mass disarmament for people convicted of an offense is unconstitutional. Not only was there a consistent practice of allowing people who broke the law to keep weapons for self-defense—at least one state appellate court and Congress agreed that disarming lawbreakers was unconstitutional.

44

As *Bruen* teaches: "[I]f some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 142 S. Ct. at 2131.

### 7. Historical laws restricting misuse of firearms in public are not relevantly similar to 18 U.S.C. § 922(g)(9).

In the proceedings below, the district court compared § 922(g)(9) to early American laws which prohibited bearing or carrying arms in public in a manner which would cause "fear" or "terror" among the people. ER 39. These laws conformed to early American practice that restricted public carry in a manner that would cause terror or fear among the people. *See Bruen*, 142 S. Ct. at 2133, 2156 (acknowledging the small number of "well-defined" restrictions on public carry under Anglo-American law, including those that limited "the intent for which one could carry arms (to terrorize the people) . . .").

Similarly, in the 19th Century, states enacted surety statutes that required the posting of a bond before individuals could bear arms in public in a manner that would result in a breach of the peace. An 1836 Massachusetts law provided that if a person was accused of going armed with a "dirk, dagger, sword or pistol or other offensive and dangerous weapon without reasonable cause to fear and assault or other injury, or violence to his person, or to his family or property," that person could be

45

compelled to post a surety bond upon complaint of any person having reasonable cause to fear and injury, or breach of the peace. *See* 1836 Mass. Acts 750, ch. 134, § 16, cited in *Bruen*, 142 S. Ct. at 2148.

Any suggestion that these laws are relevantly similar to 18 U.S.C. § 922(g)(9) requires applying a higher level of generality than is tolerated under *Bruen*. These kinds of laws did not impose a "comparable burden" to § 922(g)(9) that was "comparably justified." *Bruen*, 142 S. Ct. at 2133.

First, the burdens imposed by 19th Century surety statutes are substantially less coercive than § 922(g)(9). "These laws were not bans on public carry," let alone bans on firearm possession. *Bruen*, 142 S. Ct. at 2148. Failure to comply with the conditions of the surety bond did not result in forfeiture of weapons, merely the forfeiture of the surety bond. *Id.* And the posting of the bond could be waived where the individual could show a special need for self-defense. *Id.* For this reason, Bruen found that surety statutes imposed "insignificant" constraints on the public carry of firearms and did not impose any meaningful restrictions on firearm possession generally. *Bruen*, 142 S. Ct. at 2148-49.

In contrast, persons subject to § 922(g)(9) are disqualified from possessing weapons for life. The law makes no exception for possession of firearms for self-

defense, or possession of firearms in the home, "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628.

The burdens are also not comparably justified. As Bruen explains, surety statutes applied "only to those reasonably accused" of intending to do injury or breach the peace. *Id.* at 2148. In contrast, application of § 922(g)(9) is far less discriminating and does not require proof that the individual has a history of misusing weapons or demonstrates an intention to misuse weapons. The term "misdemeanor crime of domestic violence" encompasses "run-of-the-mill misdemeanor assault and battery laws," *Voisine v. United States*, 579 U.S. 686, 692 (2016), including those that criminalize both "least" touching and merely "offensive" touching. *United States v. Castleman*, 572 U.S. 157, 163-64 (2014). Consequently, § 922(g)(9) may result in a lifetime firearm ban for conduct that might not be characterized as "violent" in a nondomestic context. *Castleman*, 572 U.S. at 165. Indeed, application of § 922(g)(9) does not require any present showing that the individual poses a credible risk of danger to anyone. An individual's right to bear arms is terminated based solely on a past qualifying conviction, regardless of how serious the conduct, and regardless whether it involved weapons.

The fact that the statute makes it impossible for citizens to use firearms for the core lawful purposes of self-defense, *Id.* at 630, including in the home, based

solely on past conduct that may not be considered "violent," has no analogy in this Nation's history of firearm regulations. The district court erred in concluding otherwise.

### D. Numerous courts have struck down federal firearms offenses under *Bruen*, reasoning that there is no historical tradition of permanently disarming persons based on their criminal history.

To date, there have been three federal circuit decisions that have applied *Bruen* to strike down federal firearm-disarmament laws. The Fifth Circuit held in *United States v. Daniels* that 18 U.S.C. § 922(g)(3) was unconstitutional as applied to an unlawful user of marijuana who was not intoxicated when he possessed the firearm in question. 77 F.4th 337 (5th Cir. 2023). In *United States v. Rahimi*, the Fifth Circuit held that 18 U.S.C. § 922(g)(8), which prohibits possession of a firearm by a person subject to a domestic violence protective order, was facially unconstitutional. 61 F.4th 443 (5th Cir. 2023). The Supreme Court has granted certiorari in *Rahimi* with a decision expected by the end of the current term. *United States v. Rahimi*, 143 S.Ct. 2688 (June 30, 2023).

Finally, in *Range v. Att'y Gen. United States*, the Third Circuit Court of Appeals held that § 922(g)(1) was unconstitutional as applied to an individual who was disqualified from possessing a firearm based on a decades-old felony-equivalent misdemeanor conviction. 69 F.4th 96, 106 (3d Cir. 2023) (*en banc*). Applying the *Bruen* two-step framework, the Third Circuit held that persons with prior criminal

48

convictions are among "the people" who are protected by the Second Amendment. 69 F.4th at 102-103. This holding accords with the Fifth Circuit's reasoning in *Rahimi*. 61 F.4th 443, 453 (5th Cir. 2023) ("Rahimi, while hardly a model citizen, is nonetheless among 'the people' entitled to the Second Amendment's guarantees, all other things equal.")

As to *Bruen*'s second step, the Third Circuit roundly rejected the Government's assertions that § 922(g)(1) was rooted in this nation's historical tradition of firearm regulations.

First, modern laws like 18 U.S.C. § 922(g)(1) were developed in the 20th Century, well outside the relevant time period required by *Bruen*'s historical standard. *Range*, 69 F.4th at 104. Second, the Third Circuit found that none of the historical examples cited by the Government came close to resembling the modern law. The court distinguished Founding-era laws prohibiting possession of firearms by politically disfavored groups. 69 F.4th at 105 ("That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today."). The Third Circuit found that these laws were dissimilar in both the scope of the prohibitions, as well as underlying purpose.

49

Further, the Third Circuit rejected the Government's assertion that modern felon disarmament laws were comparable to the historical punishments for felony offenses: "That Founding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue — lifetime disarmament — is rooted in our Nation's history and tradition." 69 F.4th at 105.

Because the Third Circuit found that none of these historical examples were sufficiently similar to modern laws permanently disarming individuals based on prior criminal history, the application of 18 U.S.C. § 922(g)(1) to persons like Range violated the Second Amendment.

Although the *Range* majority claimed that its decision was a narrow one, its holding is plainly applicable to any person who, like Range, is disqualified from possessing firearms because of a prior conviction.[5]

Following *Range*, several district courts have also sustained as-applied challenges to federal firearm dispossession laws. Although these cases apply

---

[5] *Range*, 69 F.4th at 118 (Schwartz, J. dissenting) ("[T]he ruling is not cabined in any way and, in fact, rejects all historical support for disarming any felon. As a result, the Majority's analytical framework leads to only one conclusion: there will be no, or virtually no, felony or felony-equivalent crime that will bar an individual from possessing a firearm.").

differing levels of generality when searching for "relevantly similar" historical analogues, they agree that are no examples of pre-20th Century laws which imposed a permanent burden on an individual's Second Amendment right to bear arms outside the home based on criminal history. At most, some of these courts have acknowledged the existence of laws restricting possession of firearms by certain "dangerous" persons, but none of these laws establish a historical tradition of firearm laws which imposed permanent, lifetime dispossession.6

In *United States v. Leblanc*, the court found that the various historical examples cited by the Government as historical precursors to § 922(g)(1) failed to satisfy both prongs under *Bruen*, the "why" axis as well as the "how" axis. --- F.

---

6 *United States v. Bullock*, --- F.Supp.3d ----, 2023 WL 4232309 (S.D. Miss. June 28, 2023) (granting as-applied challenge to a prosecution under § 922(g)(1) brought against a defendant who had been convicted of aggravated assault and manslaughter); *United States v. Quailes,* --- F.Supp.3d ----, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023) (holding that § 922(g)(1) violates the Second Amendment as applied to a defendant with four prior convictions for drug trafficking); *United States v. Forbis*, --- F.Supp.3d ----, 2023 WL 5971142 (N.D. Okla. Aug. 17, 2023) (holding that § 922(g)(1) violated the Second Amendment as applied to a felon with two prior convictions for possessing methamphetamine and one conviction for DUI); *United States v. Combs,* 654 F.Supp.3d 612 (E.D. Ky. Feb. 2, 2023) (holding that § 922(g)(8) is facially unconstitutional); *United States v. Perez-Gallan* 640 F.Supp.3d 697 (W.D. Tex. Nov. 10, 2022) (same); *see also United States v. Harrison*, 654 F.Supp.3d 1191 (W.D. Okla. Feb. 3, 2023) (granting as-applied challenge to § 922(g)(3) where defendant was alleged to be user of marijuana); *United States v. Connelly*, 668 F.Supp.3d 662 (W.D. Tex. Apr. 6, 2023) (same).

Supp. 3d ----, 2023 WL 8756694 (M.D. La. Dec. 19, 2023). The Leblanc court found that laws targeting possession of firearms by loyalists, Catholics, enslaved persons, Native Americans and other "dangerous" groups were not relevantly similar historical analogues to 18 U.S.C. § 922(g)(1) because such laws were motivated by fears of collective rebellion, and not the perceived risks of personal violence posed by individuals. *Id.* at *13. Relying on *Rahimi*, the court struck down the law as applied to the defendant, who was disqualified from possessing firearms based on a prior armed robbery conviction.

In *United States v. Prince*, the district court sustained a facial challenge to § 922(g)(1), reasoning that although there were historical laws that regulated firearm possession by certain disfavored groups of people, these laws did not impose a comparable burden on the right itself. --- F.Supp.3d ----, 2023 WL 7220127, at *8 (N.D. Ill. Nov. 2, 2023).

Their reasoning differs in some respects, but cases such as *Prince* and *Leblanc* emphasize the critical differences between the historical examples cited by the Government and existing federal law. And the rigorous historical inquiry demonstrated in these cases stands in stark contrast with those cases that have applied a far more permissive standard to uphold federal firearm laws. To paraphrase Judge Reeves in Bullock, the Government's arguments for permanently disarming

Mr. Ryno rest upon the mirage of dicta, buttressed by a cloud of law review articles, that do not support disarming him. 2023 WL 4232309, at *15-26 (S.D. Miss. June 28, 2023).

This Court should follow the lead of cases like Bullock and strike down 18 U.S.C. § 922(g)(9) as unconstitutional, both facially and as applied to Mr. Ryno.

### E. Section 922(g)(9) is unconstitutional as applied to Mr. Ryno.

Finally, application of § 922(g)(9) is unconstitutional as applied to Mr. Ryno. A statute is unconstitutional as applied when "by its own terms, it infringes constitutional freedoms in the circumstances of the particular case." *United States v. Christian Echoes Nat'l Ministry, Inc.*, 404 U.S. 561, 565 (1972). The distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010); *see also Legal Aid Services of Oregon v. Legal Services Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) ("[f]acial and as-applied challenges differ in the extent to which the invalidity of a statute need be demonstrated"). The same substantive constitutional standard applies to both challenges. 608 F.3d at 1096.

In this case, application of § 922(g)(9) to Mr. Ryno is unconstitutional and would be inconsistent with the Second Amendment's text and history. *See United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) (upholding as-applied challenge to § 922(g)(3)); *Range*, 69 F.4th at 98, 106 (same for § 922(g)(1)).

53

Under Alaska law, a person commits the offense of assault in the fourth degree when they recklessly cause physical injury to another person. AS § 11.41.230(a)(1). The degree of physical injury is immaterial and may be established as long as the victim experiences a sensation of pain. Mr. Ryno's convictions did not require proof that he used "violent" force, and he is less culpable than persons who commit offenses involving intentional or knowing conduct. *See Castleman*, 572 U.S. at 163-64; *Borden v. United States*, 593 U.S. 420, 427 (2021) ("Recklessness and negligence are less culpable mental states because they instead involve insufficient concern with a risk of injury."). This kind of minimal conduct does not qualify as the kinds of violent conduct which would reasonably justify a lifetime prohibition on possession of firearms for purposes of self-defense.

Mr. Ryno is not alleged to have brandished or discharged the firearms that were seized from his possession. He did not use the firearms to commit another criminal offense. Rather, he was barred from possessing firearms because of the statute's overinclusive reach. The Government has failed to provide evidence that persons like Mr. Ryno historically lost their Second Amendment rights, and application of the law to his circumstances is unconstitutional.

## VIII.  CONCLUSION

For the foregoing, the Court should reverse and remand with instructions to

dismiss the indictment.

DATED this 29th day of February, 2024.

Respectfully submitted,

*/s/ Daniel Poulson*

Assistant Federal Defender
*Attorney for Appellant*

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES,<br><br>    Petitioner-Appellee,<br><br>    vs.<br><br>JOEL MICHAEL RYNO,<br><br>    Defendant-Appellant. | C.A. No. 23-3426<br><br>D.C. No. 3:23-cr-00045-JMK-MMS<br><br><br><br>**STATEMENT OF**<br>**INTERESTED PARTIES** |

The undersigned, counsel for Appellant, certifies that there are no known interested parties other than those participating in the case.

DATED this 29th day of February, 2024.

> Respectfully submitted,
> */s/ Daniel Poulson*
> Assistant Federal Defender
> *Attorney for Appellant*
> FEDERAL PUBLIC DEFENDER
> FOR THE DISTRICT OF ALASKA
> 188 W. Northern Lights Blvd., Suite 700
> Anchorage, AK 99503
> Phone:   907- 646-3400
> Fax:       907-646-3480
> E-Mail:  daniel_poulson@fd.org

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES,<br><br>    Petitioner-Appellee,<br><br>    vs.<br><br>JOEL MICHAEL RYNO,<br><br>    Defendant-Appellant. | C.A. No. 23-3426<br><br>D.C. No. 3:23-cr-00045-JMK-MMS<br><br>**STATEMENT OF RELATED CASES** |

Counsel is aware of at least two other cases pending in this Circuit which challenge the constitutionality of 18 U.S.C. § 922(g)(9) under *Bruen*: *United States v. Padgett*, Case No. 23-2417, and *United States v. David Paul Martinez*, Case No. 23-432. In addition, the Supreme Court is presently considering a similar challenge to the constitutionality of 18 U.S.C. § 922(g)(8) in *United States v. Rahimi*, Case No. 22-915.

DATED this 29th day of February, 2024.

Respectfully submitted,
*/s/ Daniel Poulson*
Assistant Federal Defender
*Attorney for Appellant*
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
188 W. Northern Lights Blvd., Suite 700
Anchorage, AK 99503
Phone:   907- 646-3400
Fax:        907-646-3480
E-Mail:  daniel_poulson@fd.org

57

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES,<br><br>    Petitioner-Appellee,<br><br>    vs.<br><br>JOEL MICHAEL RYNO,<br><br>    Defendant-Appellant. | C.A. No. 23-3426<br><br>D.C. No. 3:23-cr-00045-JMK-MMS<br><br><br>**CERTIFICATE OF COMPLIANCE** |

The brief is proportionately spaced, using Times New Roman 14 point. The word count is 12,589.

DATED this 29th day of February, 2024.

Respectfully submitted,

*/s/ Daniel Poulson*

Assistant Federal Defender

*Attorney for Appellant*

FEDERAL PUBLIC DEFENDER

FOR THE DISTRICT OF ALASKA

188 W. Northern Lights Blvd., Suite 700

Anchorage, AK 99503

Phone:   907- 646-3400

Fax:     907-646-3480

E-Mail:   daniel_poulson@fd.org