No. 23-3426

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff/Appellee,

v.

JOEL MICHAEL RYNO,

Defendant/Appellant.

On Appeal from the United States District Court
for the District of Alaska
No. 3:23-cr-00045
Hon. Joshua M. Kindred

APPELLEE'S ANSWERING BRIEF

S. LANE TUCKER
United States Attorney
District of Alaska

STEPHEN L. CORSO
Assistant United States Attorney
222 West 7th Avenue, #9, Room 253
Anchorage, AK 99513-7567
Telephone: (907) 271-5071
Fax: (907) 271-1500

*Attorneys for Appellee*
United States of America

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION & BAIL STATUS ............................ 1

STATEMENT OF ISSUES PRESENTED ............................................. 2

STATEMENT OF THE CASE ............................................................. 2

SUMMARY OF ARGUMENT ............................................................. 5

ARGUMENT ..................................................................................... 7

I.  Section 922(g)(9) is constitutional on its face. ............................... 7

A.  Standard of Review ............................................................... 7

B.  Discussion ........................................................................... 7

1.  Legal Background. ........................................................ 7

2.  The Second Amendment allows Congress to
    disarm persons who are a danger to others. ............... 12

a.  People who have been convicted of
    misdemeanor crimes of domestic violence
    are dangerous. ..................................................... 15

3.  Section 922(g) is consistent with the historical
    tradition of disarming dangerous people. ................... 17

a.  English history ..................................................... 18

b.  Early American history. ....................................... 21

   c. Post-Founding.....................................................24

   d. Section 922(g) is consistent with this
    tradition...............................................................29

II. Section 922(g)(9) is constitutional as applied to Ryno..................33

 A. Standard of Review ...............................................33

 B. Discussion...............................................................34

CONCLUSION .........................................................................35

STATEMENT OF RELATED CASES (Form 17)

CERTIFICATE OF COMPLIANCE (Form 8)

# TABLE OF AUTHORITIES

## Cases

*Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016) ................... 18

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................... passim

*Folajtar v. Attorney General*, 980 F.3d 897 (3d Cir. 2020) .................... 18

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) .................................... 17, 18

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) ............... 30

*New York Rifle & Pistol Association, Inc., v. Bruen*,

   142 S. Ct. 2111 (2022) ................................................................. passim

*Patterson v. Winn*, 30 U.S. (5 Pet.) 233 (1831) ....................................... 21

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ..................................... 12, 13

*State v. Davis*, 5 S.C.L. (3 Brev) 3, 4 S.C. Const. Ct. App. 1811) ..... 31, 32

*State v. Hogan*, 58 N.E. 572 (Ohio 1900) ................................................ 28

*State v. Shelby*, 2 S.W. 468 (Mo. 1886) ................................................... 28

*Thompson v. Thompson*, 218 U.S. 611 (1910) ......................................... 31

*Voisine v. United States*, 579 U.S. 686 (2016) ........................................ 35

*United States v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010) ........................ 33

*United States v. Booker*, 644 F.3d 12 (1st Cir. 2011) ......................... 9, 10

*United States v. Castleman*, 572 U.S. 157 (2014) ................................... 15

*United States v. Foster*,

   No. 23-cr-56, 2024 WL 457159 (W.D. Ky. Feb. 6, 2024) ..................... 12

*United States v. Hatch*,

   No. 22-cr-59, 2024 WL 340762. (N.D. Ind. Jan 30, 2024) ................... 12

*United States v. Hayes*, 555 U.S. 415 (2009) ............................................ 9

*United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) ........................... 13

*United States v. Jones*, No. 23-cr-52, 2023 WL 8275969

    (N.D. Ga. Nov. 30, 2023) .......................................................... 12

*United States v. Lucas*, No. 22-cr-561, 2024 WL 895317

    (N.D. Ohio Mar. 1, 2024) .......................................................... 12

*United States v. Martin*, No. 21-cr-228, 2024 WL 456703

    (E.D. Cal. Feb. 6, 2024) ............................................................ 12

*United States v. Rahimi*, 144 S. Ct. 1889 (2024).............. 10-12, 24, 29, 32

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ........................ 9, 16

*United States v. Springer*,

    No. 23-cr-1013, 2023 WL 4981583 (N.D. Iowa Aug. 3, 2023).............. 12

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) ........................ 7

## Statutes

Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the*

    *Province of Massachusetts Bay* (1869) ......................................... 22, 23

Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679

    (Albert Stillman Batchellor ed., 1904) ......................................... 22, 23

Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts (1890) .......................... 22

Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of*

    *Pennsylvania from 1682 to 1801* (1906) ............................................ 22

Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts*

    *of the General Assembly of Virginia, of a Public and Permanent*

    *Nature, as are now in Force* (1794)................................................... 22

Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York*

    (2d ed. 1807) ............................................................................. 22

iv

Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* (1815) ................................................................................ 22

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 175 ................................ 27

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92 .............................. 27

Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25..................... 28

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59 .............................. 27

Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112 ........................... 27

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 ..................... 27, 28

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 17027,......................... 28

Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30 ............. 28

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274 ................. 28

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355 ............... 28

Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394 ................. 27

Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879) .................. 27

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34 ........................................... 28

Act of June 12, 1879, § 2, 1879 Ohio Laws 192....................................... 28

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79–80 .................................. 27

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110 ........... 28

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232......................... 27

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2 ....................... 28

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87................. 27

Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881)...................... 27

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73 ............................................ 27

Act of June 10, 1881, § 1, 1881 Pa. Laws 111-12 .................................... 27

Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14 ....................... 27

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656 ............................. 27

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 ........................ 27

Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159 ................. 27

Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1 .............. 27

Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157 ......... 27

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556 ......................... 27

Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144 ................. 27

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67 ........ 27

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86 .............................. 27

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51 ............................... 27

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess.
   Laws 140 ........................................................................... 27

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69 ................................ 27

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39 .................................. 27

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.) ............................ 27

Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468 .................. 27

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83 ............ 27

Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221 ............................... 27

Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21 ................ 27

*Acts and Laws of His Majesties Colony of Connecticut in
   New-England* (1901) (1702 law) ........................................... 24

Alaska Stat. § 11.41.230(a)(1) ................................................... 35

Alaska Stat. § 11.81.900(a)(3) .................................................. 35

Federal Firearms Act, ch. 850, § 2(d)–(f), 52 Stat. 1251 ......................... 29

1 General Public Statutory Law and Public Local Law
  of the State of Maryland, from the Year 1692 to 1839
  Inclusive: With Annotations Thereto, and a Copious Index,
  pg. xxx (1840) (1776 Declaration of Rights) .......................................... 24

Ky. Gen. Stat. ch. 29, Art. 29, § 1
  (Edward I. Bullock & William Johnson eds., 1873) ............................... 27

*1 Laws of the State of Delaware from the Fourteenth Day
  of October, One Thousand Seven Hundred, to the
  Eighteenth Day of August, One Thousand Seven Hundred
  and Ninety-Seven* (1797) (1700 law) ............................................... 23, 24

Mass. Rev. Stat. ch. 134, § 16 (1836) ...................................................... 25

Militia Act 1662, 13 & 14 Car. 2, c. 3 § 13 ............................................. 19

Miss. Rev. Code ch. 77, § 2964 (1880) .................................................... 27

Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland*,
  1638–1674 (E.B. O'Callaghan ed., 1868) .............................................. 22

*2 Statutes at Large of Pennsylvania from 1682 to 1801*,
  pg. 23 (1896) (1700 law) ....................................................................... 23

*13 Statutes at Large; Being a Collection of All the Laws of
  Virginia, from the first Session of the Legislature,
  in the Year 1619* (1823) (1789 law) ...................................................... 24

1 Mo. Rev. Stat. ch. 24, Art. II, § 1274 (1879) ................................... 27, 28

1 W. & M., ch. 2 § 7, in 3 Eng. State. at Large 441 ............................... 13

1 W. & M. Sess. II, c. 2 (1688) ................................................................ 19

18 U.S.C. § 922(g)(8) ......................................................................... 10, 11, 29

18 U.S.C. §§ 922(g)(9) ...................................................................... passim

18 U.S.C. § 924(a)(2) .................................................................................. 4

18 U.S.C. § 3231 ................................................................................ 1

28 U.S.C. § 1291 ............................................................................... 2

## U.S. Constitution

U.S. Const. amend. II .......................................................................7

## Other Authorities

Julia C. Babcock, et al., *Does Batterer's Treament Work? A Meta-Analysis Review of Domestic Violence Treatment*, 23 Clinical Psychology Rev. 10123 (2004) ............................................17

Theodore Barlow, *The Justice of Peace* 367 (1745) ............................... 20

*Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702* (Feb. 26, 1701) (Edward Bateson ed., 1937) ..................................................19

Anthony A. Braga et al.*, Firearm Instrumentality: Do Guns Make Violent Situations  More Lethal,* 2021 Ann. Rev. Criminology 147 ...............................................................15

4 William Blackstone, *Commentaries on the Laws of England* (1769) .......................................................................23

4 William Blackstone, *Commentaries on the Laws of England* (10th ed. 1787)...............................................................20

1 Richard Burn, *The Justice of the Peace, and Parish Officer* (2d ed. 1756) ..................................................................20

James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.) .......................................................................21

Joseph Gales, *Prevention of Crime, in Early Indiana Trials and Sketches* (1858) ......................................................................25

Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708) ..................20

Jill A. Gordon & Laura J. Moriarty, *The Effects of Domsetic Violence Batterer Treatment on Domestic Violence Recidivism,* 30 Crim. Just. & Behavior 118 (2003) ..................................................16

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.)......................................21

Joseph G.S. Greenlee*, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms,* 20 Wyo. L. Rev. 249 (2020) ...........................................................17, 18

1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716) ...................................................................20

William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.) ....................................................................21, 22

John Holmes, *The Statesman, or Principles of Legislation and Law 186 (1840)*..........................................................24, 25

G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737).......................................20

Giles Jacob, *The Modern Justice* 338 (1716) ...........................................20

6 *Documentary History of the Ratification of the Constitution* (John P. Kaminski & Gaspare J. Saladino eds., 2000).......................14

Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 Documentary History of the Ratification of the Constitution 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001)...............14

Aaron J. Kivisto & Megan Porter, *Firearm Use Increases Risk of Multiple Victims in Domestic Homicides*, 48 J. Am. Acad. Psychiatry L. 26 (2020) ............................................. 15

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22–24 (2d ed. 1792) (N.H.) ..................................................................... 22

John H. Laub & Robert J. Sampson, *Understanding Desistance from Crime,* 28 Crime & Justice 1 (2001) ........................................... 16

Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), in Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) ............................. 20

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130–32 (1994) ................................................ 21

Nat'l Inst. of Justice, Office of Justice Programs, U.S. Dep't of Justice, *Special Report, Practical Implicatinos of Current Domestic Violence Research: For Law Enforcement, Prosecutors, and Judges* 26 (June 2009) ...................................... 15, 16

W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721) ..................................................................... 20

Order of Council to Lord Lieutenants (Sept. 5, 1745), in Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) ...................................................... 20

Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397 (2019) .................................... 19

x

James Parker, *Conductor Generalis* 12 (1764) (N.J.) ............................ 22

James Parker, *Conductor Generalis* 12

    (Robert Hodge printing 1788) (N.Y.) .................................................... 22

James Parker, *Conductor Generalis* 11

    (Robert Campbell printing 1792) (Pa.) .................................................. 22

Elizabeth Pleck, *Criminal Approaches to Family Violence*,

    1640–1980, 11 Crime & Just. 19 (1989) ........................................ 30, 31

Privy Council to the Earl of Carlisle (July 30, 1714), in Historical

    Manuscripts Commission, *Tenth Report, Appendix, Part IV* 343

    (1885) ........................................................................................ 19, 20

William Rawle, *A View of the Constitution of the United States of*

    *America* (2d ed. 1829) ........................................................................ 24

Tapping Reeve, *The Law of Baron and Femme; of Parent*

    *and Child; of Guardian and Ward; of Master and Servant;*

    *and of the Powers of Courts of Chancery*

    (New Haven, Oliver Steele 186) ........................................................... 31

Randolph Roth, *American Homicide* (2009) ........................................... 32

Randolph Roth, *Why Guns Are and Are Not the Problem in*

    *A Right to Bear Arms?: The Contested Role of History in*

    *Contemporary Debates on the Second Amendment*

    117 (2019) ............................................................................ 26, 32, 33

2 Bernard Schwartz, *The Bill of Rights: A Documentary History*

    (1971) ................................................................................................ 13

Joseph Shaw, *The Practical Justice of Peace, and Parish*

    *and Ward Officer* 231 (6th ed. 1756) ................................................... 20

xi

Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative* and
Privacy, 105 Yale L.J. 2117 (1996) ...................................................... 31

Carla Smith Stover, *Domestic Violence Research,* 20 J.
 Interpersonal Violence 448 (2005) .............................................. 16, 17

*State Convention of the Suffrage men of Rhode Island,*
Vermont Gazette, Dec. 13, 1842 ........................................................ 25

Violence Policy Center, *When Men Murder Women:*
 *An Analysis of 2018 Homicide Data* (Sept. 2020) ............................. 33

2 Edw. 3, c. 3 (1328) .............................................................................. 20

142 Cong. Rec. 22985 (1996) (statement of Sen. Lautenberg) ................ 9

142 Cong. Rec. S8831 (daily ed. July 25,1996)
 (statement of Sen. Lautenberg) ...................................................... 9, 10

**INTRODUCTION**

Defendant-Appellant Joel Michael Ryno pleaded guilty to possessing a firearm as a prohibited person. After disturbing and intimidating episodes with his live-in girlfriend, who was the mother of his young child, Ryno was convicted of separate misdemeanor domestic violence crimes. Thus, under 18 U.S.C. § 922(g)(9), he could not possess a gun. On appeal, Ryno argues that this statutory provision is unconstitutional after *New York Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

Ryno's arguments fail. Section 922(g)(9) is consistent with the Nation's long tradition of disarming people who are deemed dangerous. And Ryno's domestic violence convictions suggest that the statute is constitutional as applied to him.

This Court should uphold § 922(g)(9) and affirm his conviction.

**STATEMENT OF JURISDICTION & BAIL STATUS**

The district court had subject matter jurisdiction over this criminal proceeding. 18 U.S.C. § 3231. The district court entered judgment on November 7, 2023, and Ryno filed a timely notice of appeal

1

that same day.[1] (ER-3, 119.) This Court has jurisdiction. 28 U.S.C.

§ 1291.

Ryno is in federal custody. According to the Bureau of Prisons, his

projected release date is September 4, 2026.

## STATEMENT OF ISSUES PRESENTED

I.      Whether 18 U.S.C. § 922(g)(9) on its face violates the Second
        Amendment.

II.     Whether § 922(g)(9) violates the Second Amendment as applied to
        Ryno.

## STATEMENT OF THE CASE

**A.    Facts**

### 1.     Ryno is convicted of two misdemeanor domestic violence offenses.

Ryno's criminal history spans nearly a decade and includes

convictions for fighting, illegal hunting, unlawful possession of a

firearm, and assaults with firearms and other weapons and objects.

(PSR ¶¶ 31-37.) In July 2017, he had a frightening episode with his live-

in girlfriend in which, among other things, he threatened to kill her,

threw her possessions out of their home, hit her, acted like he was going

---

[1] "ER" refers to Ryno's Excerpts of Record; "PSR" refers to the
Presentence Report.

2

to shoot her, stabbed a door with a screwdriver and a knife several times, pointed a knife at her, and held her against the garage door using a gun and then a screwdriver—while she held their infant in her arms. (PSR ¶ 36.) She feared that he would kill her. (PSR ¶ 36.) In October 2019, he flipped over their kitchen table, causing it to strike her. (PSR ¶ 37.) He told her that he would kill himself if she reported the incident to police, as he did not want to return to jail. (PSR ¶ 37.)

Ryno was convicted of separate misdemeanor crimes of domestic violence for both incidents, first in Alaska case 3PA-17-01151 CR in April 2019, and then in case 3PA-19-02536 CR in June 2021. (PSR ¶¶ 36-37.) In August 2021, the state court issued two long-term protective orders safeguarding Ryno's girlfriend and their young child from him. (PSR ¶ 9.)

### 2. Ryno possesses firearms having been convicted of domestic violence.

In December 2020, after Ryno's first domestic violence conviction, a police officer stopped Ryno in his car and discovered a rifle and ammunition in his possession. (ER-44.) In February 2022, after his second domestic violence conviction, a police officer responding to a domestic violence call found Ryno in possession of a handgun and

3

ammunition. (ER-44.) A federal agent showed Ryno court documents stating that his domestic violence convictions prohibited him from possessing firearms. (PSR ¶ 13; ER-44.) Two months later, on April 16, 2022, police officers approached Ryno as he slept behind the wheel of a car parked along a public highway. (PSR ¶ 14; ER-44.) He was armed with two handguns. (PSR ¶ 14.)

## B.   Procedural History

In May 2022, Ryno was indicted on three counts of possessing firearms as a prohibited person, in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(2). (ER-115-18.) He moved to dismiss the indictment, arguing that § 922(g)(9) violated the Second Amendment as applied to him under *New York Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). (Dkt. 30.) A magistrate judge heard argument and issued a final report and recommendation advising the district court to deny the motion. (ER-41-69.) In May 2023, the district court adopted the R&R and denied the motion. (ER-27-40.)

Ryno pleaded guilty to Count Three of the indictment, which charged him with possessing handguns as he slept in the car. (ER-3, 44, 117.) In his plea agreement, Ryno preserved the right to appeal the

constitutionality of § 922(g)(9) after *Bruen*. (ER-20.) In November 2023, the district court sentenced him to 37 months in prison followed by three years' supervised release. (ER-4, 5.)

This appeal followed. (ER-119.)

## SUMMARY OF ARGUMENT

The district court correctly ruled that 18 U.S.C. § 922(g)(9) is constitutional on its face.

The statute is consistent with the Second Amendment's text. The Second Amendment protects the "right of law-abiding, responsible citizens" to bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). That authoritative interpretation of the amendment's scope is consistent with the historical understanding of the right. For example, the English Bill of Rights and the ratification debates surrounding the United States Constitution reflect an understanding that the right to bear arms did not extend to those who posed a danger to others. And those who have been convicted of crimes of domestic violence, like Ryno, are dangerous.

Section 922(g)(9) is also consistent with the Nation's historical tradition of regulating firearms. For example, the English Militia Act of

1662 allowed officials to disarm those they judged dangerous to the peace of the kingdom. The common law tradition, codified in several American colonies, allowed justices of the peace to disarm and punish those who went armed to the terror of the people. And laws enacted after the founding confirm a common understanding that dangerous people could be disarmed. And so, there is a consensus among courts and scholars that disarming those who pose a danger to others is consistent with the historical tradition. Thus, § 922(g)(9) is a constitutional exercise of Congress's power to disarm those who are dangerous.

Section 922(g)(9) is also constitutional as applied to Ryno. The combination of violent force, lethal threats, and the proximity of an infant or toddler highlights the seriousness of Ryno's criminal conduct. His striking his live-in girlfriend, pointing a knife at her, and pinning her against a door using a gun and then a screwdriver as she held their infant is exactly the type of behavior that Congress addressed in § 922(g)(9).

//

//

6

## ARGUMENT

I.   **Section 922(g)(9) is constitutional on its face.**

A.   **Standard of Review**

This Court reviews de novo the constitutionality of a statute. *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010). Similarly, this Court also reviews de novo constitutional challenges to a district court's denial of a motion to dismiss. *Id.*

B.   **Discussion**

1.   **Legal background.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. But *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022), the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a

7

handgun for self-defense outside the home." *Bruen* struck down a New York law that required residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2122, 2156

*Bruen* rejected the "two-step" framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Id.* 2125-26. And *Bruen* "reiterate[d]" the "standard for applying the Second Amendment." *Id.* at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when a regulation burdens such conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

In considering whether a modern regulation is "relevantly similar" to historical laws, courts should consider "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. That is, the "central" considerations are "whether modern and historical regulations impose a comparable

8

burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133 (emphasis and quotation marks omitted). The government need only identify "a well-established and representative historical analogue, not a historical twin." *Id.* "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

In 1996, Congress extended § 922(g)'s regulation of firearms to prohibit persons convicted of "a misdemeanor crime of domestic violence" from possessing them. 18 U.S.C. § 922(g)(9). Congress enacted § 922(g)(9) fearing that felon-in-possession laws were not keeping guns from domestic abusers because "many people who engage in serious spousal or child abuse ultimately [were] not charged with or convicted of felonies." *United States v. Hayes*, 555 U.S. 415, 426 (2009) (quoting 142 Cong. Rec. 22985 (1996) (statement of Sen. Lautenberg) (internal quotation marks omitted)); *see also United States v. Skoien*, 614 F.3d 638, 639 (7th Cir. 2010). Through § 922(g)(9), "Congress sought to 'close this dangerous loophole' and 'establish [ ] a policy of zero tolerance when it comes to guns and domestic violence.'" *United States v. Booker*, 644 F.3d 12, 16 (1st Cir. 2011) (quoting 142 Cong. Rec. S8831 (daily ed.

9

July 25, 1996) (statement of Sen. Lautenberg) (internal quotation marks omitted) (emphasis added)). Thus, the legislative history of § 922(g)(9) shows that Congress intended to keep firearms out of the hands of a specific type of dangerous criminal—domestic abusers.

Neither the Supreme Court nor the Ninth Circuit has directly addressed whether § 922(g)(9) is constitutional after *Bruen*. But the Supreme Court recently upheld the constitutionality of § 922(g)(8), which prohibits people subject to domestic violence protection orders from possessing firearms. *United States v. Rahimi*, 144 S. Ct. 1889 (2024). *Rahimi* provides guidance here.

In reversing the Fifth Circuit, the Court held that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi*, 144 S. Ct. at 1903. The Court observed that "some courts have misunderstood the methodology of our recent Second Amendment cases," which "were not meant to suggest a law trapped in amber." *Id.* at 1897. It emphasized that a modern regulation "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* at 1898. And the

10

Court explained that laws at the time of the American founding "target[ed] individuals who physically threatened others." *Id.* at 1899.

In reviewing historical laws, the Court pointed to old surety laws and "going armed" laws (which prohibited those "who had menaced others with firearms" from carrying guns). *Id.* at 1899-1901. Although § 922(g)(8) "is by no means identical to these founding-era regimes," it nevertheless "fits neatly within the tradition the surety and going armed laws represent." *Id.* at 1901. And so, the Court concluded that "[t]aken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.*

The Court rejected the defendant's facial challenge to §922(g)(8) because the statute could constitutionally be applied to him. *Id.* at 1902. But it noted that its holding was not premised on the defendant being "not 'responsible,'" which it said was a "vague term" and did not define who possesses the Second Amendment right. *Id.* at 1903. *See Heller*, 554 U.S. at 635 (Congress may disarm individuals who are not "law-abiding, responsible citizens."). The Court also noted that facial challenges are

11

the most difficult to mount, as they require a defendant to show that "no set of circumstances exists under which the [statute] would be valid." *Rahimi*, 144 S. Ct. at 1898.

Thus far, all other district courts to consider § 922(g)(9)'s constitutionality since *Bruen* have unanimously upheld the statute.[2]

### 2. The Second Amendment allows Congress to disarm persons who are a danger to others.

The Second Amendment's history confirms that it does not protect the right of lawbreakers and dangerous people to possess firearms. *Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The 1689 English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," *id.*

---

[2] *See, e.g.*, *United States v. Lucas*, No. 22-cr-561, 2024 WL 895317 (N.D. Ohio Mar. 1, 2024); *United States v. Martin*, No. 21-cr-228, 2024 WL 456703 (E.D. Cal. Feb. 6, 2024); *United States v. Foster*, No. 23-cr-56, 2024 WL 457159 (W.D. Ky. Feb. 6, 2024); *United States v. Hatch*, No. 22-cr-59, 2024 WL 340762 (N.D. Ind. Jan. 30, 2024); *United States v. Jones*, No. 23-cr-52, 2023 WL 8275969 (N.D. Ga. Nov. 30, 2023); *United States v. Springer*, No. 23-cr-1013, 2023 WL 4981583 (N.D. Iowa Aug. 3, 2023).

at 593, provided that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law," *id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). The wording of that provision indicates that Parliament could exclude those who broke the law or whose "[c]onditions" were unsuitable to firearm possession. *See United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023). Thus, when the "Second Amendment . . . codified [the] pre-existing right" to bear arms, *Heller*, 554 U.S. at 592, it codified a right that was "not unlimited," *id.* at 626, and was not understood to extend to lawbreakers and the dangerous.

Precursors to the Second Amendment proposed at the state ratifying conventions also indicate that legislatures can disarm lawbreakers and those who are dangerous. A proposed bill of rights presented at the Pennsylvania ratifying convention stated that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624,

which was widely read and proved "highly influential" on the Bill of Rights. *Heller*, 554 U.S. at 604.

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." 6 Documentary History of the Ratification of the Constitution 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 Documentary History of the Ratification of the Constitution 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001).

Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604. The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id.* at 603-05. The precursors discussed above

14

reveal a common conception that the government may disarm those who dangerous. *See id.* at 635.

### a. People who have been convicted of misdemeanor crimes of domestic violence are dangerous.

People who have been convicted of a misdemeanor crime of domestic violence pose a threat to the physical safety of others. Their continued possession of firearms imperils their intimate partners. "Domestic violence often escalates in severity over time," and "the presence of a firearm increases the likelihood that it will escalate to homicide." *United States v. Castleman*, 572 U.S. 157, 160 (2014). The presence of a gun in a household with a domestic abuser increases the risk of homicide fivefold. Aaron J. Kivisto & Megan Porter, *Firearm Use Increases Risk of Multiple Victims in Domestic Homicides*, 48 J. Am. Acad. Psychiatry L. 26, 26 (2020). And domestic assaults with guns are around twelve times likelier to cause death than assaults without guns. *See* Anthony A. Braga et al., *Firearm Instrumentality: Do Guns Make Violent Situations More Lethal*, 2021 Ann. Rev. Criminology 147, 153. Abusers often use guns to intimidate their partners—for instance, by brandishing or firing guns during arguments. *See* Nat'l Inst. of Justice,

Office of Justice Programs, U.S. Dep't of Justice, *Special Report,*
*Practical Implications of Current Domestic Violence Research: For Law*
*Enforcement, Prosecutors and Judges* 26 (June 2009), available at
https://www.ojp.gov/pdffiles1/nij/225722.pdf.

      Domestic abuse has a high recidivism rate. S*ee United States v.*
*Skoien*, 614 F.3d 638, 644 (7th Cir. 2010). A 2003 study in Chesterfield
County, Virginia, found that 47% of domestic violence offenders
sentenced to a probation term were rearrested and 29% were rearrested
within one year of sentencing. Jill A. Gordon & Laura J. Moriarty, *The*
*Effects of Domestic Violence Batterer Treatment on Domestic Violence*
*Recidivism*, 30 Crim. Just. & Behavior 118, 124 (2003). Another study
shows that only 48% of domestic abusers halted violence in their
marital relationships within three years of conviction. John H. Laub &
Robert J. Sampson, *Understanding Desistance from Crime*, 28 Crime &
Justice 1, 31 (2001), available at http://nrs.harvard.edu/urn-
3:HUL.InstRepos:3226958. As the Seventh Circuit observed, this
statistic "means that the other 52% did not, and that even the 48% may
have committed new crimes within three years after conviction."
*Skoien*, 614 F.3d at 644. Other estimates of domestic violence recidivism

16

range from 40% to 80% based on victim surveys. Carla Smith Stover, *Domestic Violence Research*, 20 J. Interpersonal Violence 448, 450 (2005); *see also* Julia C. Babcock, et al., *Does Batterers' Treatment Work? A Meta–Analytic Review of Domestic Violence Treatment*, 23 Clinical Psychology Rev. 1023, 1039 (2004) (estimating a 21% recidivism rate based on police report and a 35% recidivism rate based on partners' reports).

In sum, Ryno and other persons convicted of misdemeanor crimes of domestic violence fall squarely within the category of dangerous people whom the Second Amendment has always allowed Congress to disarm.

### 3. Section 922(g)(9) is consistent with the historical tradition of disarming dangerous people.

Courts and commentators widely agree that disarming dangerous people is consistent with the American tradition. Some judges and commentators have incorrectly maintained that only dangerous people may be disarmed—and that, for example, non-dangerous felons cannot be disarmed. *See, e.g., Kanter v. Barr*, 919 F.3d 437, 451-64 (7th Cir. 2019) (Barrett, J., dissenting); Joseph G.S. Greenlee*, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*,

17

20 Wyo. L. Rev. 249, 257-67, 285-86 (2020). But even these judges and commentators agree that "[h]istory . . . demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting); *see Binderup v. Attorney General*, 836 F.3d 336, 368-69 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public."); *Folajtar v. Attorney General*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting) ("English and early American laws disarmed the dangerous." (italics omitted)); Greenlee, 20 Wyo. L. Rev. at 272 (observing that in "each [relevant] historical period," "violent or otherwise dangerous persons could be disarmed"). This scholarly consensus is supported by ample historical evidence from English history, colonial American history, and the period after the founding.

### a. English history.

The Second Amendment "was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599. And the English right was not

18

understood to prevent the disarming of dangerous people. In England, the 1662 Militia Act empowered the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13. Parliament subsequently recognized a legal right to possess arms in the Bill of Rights, which protected the right of Protestants to "have Arms for their Defence suitable to their Conditions and as allowed by Law." 1 W. & M. Sess. II, c. 2 (1688) (Eng.).

While condemning the disarming of "good subjects," 1 W. & M. Sess. II, c. 2, the English Bill of Rights allowed the disarming of dangerous ones. It did not displace the 1662 Militia Act, the use of which "continued unabated" after the adoption of the English Bill of Rights. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019).[3] Indeed, many 18th-century

---

[3] *See, e.g., Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700-8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), in Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV*

justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[4]

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 142 S. Ct. at 2139-42. Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, and that it made violations punishable by forfeiture of the weapons.[5] And, even at the time of the American Revolution, the English Bill of Rights was understood to allow disarming irresponsible and non-peaceable subjects. In 1780, after

_____

343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), in Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), in Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar)

[4] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); *see, e.g.,* Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

[5] *See, e.g.*, 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787); 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

20

London officials responded to widespread rioting by confiscating rioters' arms, the House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-32 (1994). Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, this history shows that the Second Amendment likewise allows Congress to disarm those who are dangerous.

### b. Early American history.

American colonies—and later states—also quickly developed a tradition of disarming those who were considered dangerous. Early American justice-of-the-peace manuals explained that the Statute of Northampton—which the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn*, 30 U.S. (5 Pet.) 233, 241 (1831)—empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[6] Some

---

[6] *See, e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12–13 (1773) (Mass.); William Waller Hening,

21

17th- and 18th-century American statutes expressly recodified that

rule.[7] Others made forfeiture part of the penalty for offenses such as

unsafe storage of guns or gunpowder.[8] Although those laws involved

forfeiture of arms involved in an offense, rather than bans on possessing

arms, they show that legislatures could restrict an individual's ability to

bear arms if his conduct suggested that his possession of firearms would

endanger others.

Also, the American colonies carried over the English common law

surety practice, designed to protect those who faced a threat of harm. As

---

*The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22–24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).
[7] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52–53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).
[8] *See* Act of Mar. 1, 1783, ch. 46, 1782–83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland*, 1638–1674, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York*, 95–96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209–10 (1906).

Blackstone explained, whenever "any private man ha[d] just cause to fear, that another w[ould] burn his house, or do him a corporal injury, by killing, imprisoning, or beating him," the threatened person could "demand surety of the peace against such person." 4 William Blackstone, *Commentaries on the Laws of England* 252 (1769). If the threatening person failed to find sureties, he could be immediately committed to jail. *Id.*

Several American jurisdictions expressly codified this surety system. Two of the colonies that codified the Statute of Northampton (Massachusetts Bay and New Hampshire) passed laws requiring those who went "armed offensively" to obtain sureties of the peace or of good behavior.[9] And by 1791, at least five additional jurisdictions had codified or presumed the availability of the common-law surety system.[10]

---

[9] 1 Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904).
[10] *See 2 Statutes at Large of Pennsylvania from 1682 to 1801*, pg. 23 (1896) (1700 law); 1 *Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven* 52 (1797)

23

As the Supreme Court recognized in *Rahimi*, the surety laws and going armed laws sought to prevent firearms violence before it occurred. 144 S. Ct. at 1899-1901.

### c.    Post-founding.

Post-ratification commentators and legislation confirm that the Second Amendment allows disarming the dangerous. One legal scholar observed that the Second Amendment should not be "abused to the disturbance of the public peace" and allowed restricting a person's right to carry firearms where there was "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). Another scholar interpreted the Second Amendment and its state counterpart to mean that a "free citizen, if he demeans himself peaceably, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation*

---

(1700 law); *Acts and Laws of His Majesties Colony of Connecticut in New-England* 91 (1901) (1702 law); 1 *General Public Statutory Law and Public Local Law of the State of Maryland, from the Year 1692 to 1839 Inclusive: With Annotations Thereto, and a Copious Index*, pg. xxx (1840) (1776 Declaration of Rights); 13 *Statutes at Large; Being a Collection of All the Laws of Virginia, from the first Session of the Legislature, in the Year 1619*, 41 (1823) (1789 law).

*and Law* 186 (1840) (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. And a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime*, in O.H. Smith, *Early Indiana Trials and Sketches* 466-67 (1858).

In the 1840s, states began to adopt surety statutes that required certain potentially irresponsible individuals who carried firearms to post bond. *See Bruen*, 142 S. Ct. at 2148. The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen*, 142 S. Ct. at 2148 n.23 (collecting statutes).

As the 19th century wore on, guns became more lethal and more widely available. Guns in the 18th century generally fired only one shot, often misfired, took a long time to load, and could not be kept loaded for long periods. Randolph Roth, *Why Guns Are and Are Not the Problem, in Jennifer Tucker et al. eds., A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). But technological developments in the 1800s—such as metallic cartridges; cheap, mass-produced revolvers; and guns capable of firing multiple shots—led to the increased use of guns in homicides. *Id.* at 123-27. During this time, legislatures disarmed a range of individuals whom they deemed unfit to carry firearms, including those below

certain ages,[11] those of unsound mind,[12] vagrants,[13] and intoxicated

persons.[14]

---

[11] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1–2, 1882 N.J. Acts 13–14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79–80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111–12; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140

[12] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20–21.

[13] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1,

State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900).

//

//

//

---

1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274

[14] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879).

### d. Section 922(g)(9) is consistent with this tradition.

Section 922(g)(9) fits squarely within this longstanding tradition. Like the historical laws discussed above, § 922(g)(9) disarms those who pose a danger to others. Those convicted of misdemeanor crimes of domestic violence are dangerous citizens. And, as discussed earlier, those who commit these types of crimes are likely to reoffend or commit new crimes. Thus, § 922(g)(9) is consistent with the historical tradition of disarming the potentially dangerous. Indeed, under § 922(g)(8), a person "found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi*, 144 S. Ct. at 1903.

That these historical laws did not specifically target those who abused intimate partners is of no moment. Indeed, the Supreme Court has made clear that a modern regulation can comply with the Second Amendment even if it lacks "a historical twin." *Bruen*, 142 S. Ct. at 2133 (emphasis omitted). For example, the Amendment allows Congress to disarm felons, *see Heller*, 554 U.S. at 626, even though the first federal law disarming felons dates to 1938, *see* Federal Firearms Act, ch. 850, § 2(d)-(f ), 52 Stat. 1251. And although "the historical

29

record yields relatively few 18th- and 19th-century 'sensitive places'"—
for example, "legislative assemblies, polling places, and courthouses"—
the Amendment allows "modern regulations prohibiting the carry of
firearms in new and analogous sensitive places." *Bruen*, 142 S. Ct. at
2133. Relatedly, the Court has dismissed, as "bordering on the
frivolous," the argument that the Amendment protects "only those arms
in existence in the 18th century." *Heller*, 554 U.S. at 582. The notion
that the Amendment permits only those regulations that existed in the
18th century has no more merit. *Cf. McIntyre v. Ohio Elections
Commission*, 514 U.S. 334, 373 (1995) (Scalia, J., dissenting) ("Quite
obviously, not every restriction upon expression that did not exist in
1791 or 1868 is *ipso facto* unconstitutional.").

Past legislatures may have declined to enact a law exactly like
§ 922(g)(9) for a variety of reasons. To start, at the founding, domestic
violence went largely unlegislated. "The whole of the eighteenth and
half of the nineteenth century appears to have been a legislative
vacuum. Indeed, there is little evidence, aside from an occasional
divorce case on grounds of cruelty, to demonstrate even passing interest
in this subject during the eighteenth century." Elizabeth Pleck,

30

*Criminal Approaches to Family Violence*, 1640-1980, 11 Crime & Just. 19, 29 (1989). Also, for much of the Nation's history, the common-law doctrine of interspousal tort immunity precluded courts from hearing abused wives' civil suits against their husbands. *See Thompson v. Thompson*, 218 U.S. 611, 618 (1910); Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2161-70 (1996).

Past legislatures, too, may have assumed that protections such as the common-law surety system or criminal laws against assault were sufficient to prevent spousal violence. As America's first family law treatise explained, a husband or wife's "violation of each other's rights, by an unjustifiable violence, is a breach of the laws of society, for which they are liable *criminaliter*." *See* Tapping Reeve, *The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery* 65 (New Haven, Oliver Steele 1816). And, the treatise explained, a husband or wife "may institute a process against each other, the object of which is to compel them to find securities for their good behaviour." *Id.* at 65-66; *see State v. Davis*, 5 S.C.L. (3 Brev.) 3, 4 (S.C. Const. Ct. App. 1811) ("It is clear

31

that a wife may demand sureties of the peace against her husband, and so may her husband against her."). The assumption that other laws would adequately address spousal violence is particularly likely given that "[f]amily and intimate homicides were extremely rare" in colonial America. Randolph Roth, *American Homicide* 108 (2009).

In any event, Justice Barrett in her concurrence in *Rahimi* identified two of the pitfalls of holding modern legislatures to the founding era's legislative judgments. 144 S. Ct. at 1925 (Barrett, J., concurring). It traps the law in "amber." *Id.* And it ignores the common-sense conclusion that founding-era legislatures did not "maximally" exercise their regulatory authority. *Id.*

Lastly, because of technological differences, the combination of firearms and domestic strife did not pose the same threat in the past that it poses today. Because guns in the 18th century had a variety of technological limitations, household homicides in colonial times were only rarely committed with guns. Roth, *supra*, *Why Guns Are and Are Not the Problem* at 108, 116-17. But later technological developments— such as metallic cartridges; cheap, mass-produced revolvers; and guns capable of firing multiple shots—have led to the increased use of guns

32

in homicides, including domestic homicides. *See id.* at 123-27. Now, more than half of the women who are killed by their intimate partners are killed with guns. *See* Violence Policy Center, *When Men Murder Women: An Analysis of 2018 Homicide Data* 5 (Sept. 2020). *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders" and that the Second Amendment does not prevent Congress from adopting new laws to respond to "unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132. Thus, § 922(g)(9) is consistent with the historical tradition even though it does not burden firearm possession in precisely the same way or for precisely the same reasons as founding-era laws.

## II. Section 922(g)(9) is constitutional as applied to Ryno.

### A. Standard of Review

The constitutionality of a statute receives de novo review, whether the challenge is facial or as-applied. *United States v. Alvarez*, 617 F.3d 1198, 1201 (9th Cir. 2010).

//

//

//

**B.    Discussion**

Whether this Court examines the facts underlying Ryno's convictions or the elements of his domestic violence offenses, both show that he is dangerous for Second Amendment purposes.

In the first of his violent altercations that led to conviction, he hit his live-in girlfriend, acted like he was going to shoot her, stabbed a door with a screwdriver and a knife several times, pointed a knife at her, and held her against the garage door using a gun and then a screwdriver—while she had their infant in her arms. (PSR ¶ 36.) In the second, he flipped over their kitchen table, causing it to strike her, and told her that he would kill himself if she reported this incident to police. (PSR ¶ 37.)

These factual circumstances are troubling. The combination of violent force, lethal threats, and the proximity of an infant or toddler highlights the seriousness of the offenses. And far from "minimal conduct," these acts are exactly the type of dangerous behavior that Congress addressed in § 922(g)(9).

Even if the Court only looks to the statute of conviction, disarming Ryno does not run afoul of the Second Amendment. Ryno was convicted

34

of Assault in the Fourth Degree, in violation of Alaska Stat.

§ 11.41.230(a)(1), which prohibits recklessly causing physical injury to

another person. Under Alaska law,

> a person acts "recklessly" with respect to a result or to a
> circumstance described by a provision of law defining an
> offense when the person is aware of and consciously
> disregards a substantial and unjustifiable risk that the
> result will occur or that the circumstance exists; the risk
> must be of such a nature and degree that disregard of it
> constitutes a gross deviation from the standard of conduct
> that a reasonable person would observe in the situation.

Alaska Stat. § 11.81.900(a)(3).

Ryno's claim that the *mens rea* of recklessness makes him less

culpable than those who are convicted of knowing or intentional conduct

fails. As the Supreme Court observed, "A person who assaults another

recklessly 'use[s]' force, no less than one who carries out that same

action knowingly or intentionally." *Voisine v. United States*, 579 U.S.

686, 695 (2016). Also, those who have injured another person

recklessly—grossly deviating from the standard of conduct that a

reasonable person would observe—are among the class of dangerous

citizens who can be disarmed.

## CONCLUSION

The district court's judgment should be affirmed.

35

RESPECTFULLY SUBMITTED, July 29, 2024, at Anchorage,

Alaska.

S. LANE TUCKER
United States Attorney

s/ Stephen L Corso
STEPHEN L. CORSO
Assistant United States Attorney
222 West 7th Avenue, #9, Room 253
Anchorage, AK 99513-7567
Telephone: (907) 271-5071
Fax: (907) 271-1500

*Attorneys for Appellee*
United States of America

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 23-3426

The undersigned attorney or self-represented party states the following:

(•) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Stephen L. Corso    **Date** | Jul 29, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                 *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-3426

I am the attorney or self-represented party.

**This brief contains** 7,315 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Stephen L. Corso      **Date** 07/29/2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*