No. 23-3426

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**JOEL MICHAEL RYNO,**

Defendant-Appellant.

Appeal from the
United States District Court
for the District of Alaska
Honorable JOSHUA M. KINDRED
Dist. Ct. Case No. 3:23-cr-00045-JMK-MMS

**APPELLANT'S REPLY BRIEF**

DANIEL POULSON
Assistant Federal Defender
Federal Public Defender for the District of Alaska
Address: 188 W. Northern Lights Blvd., Suite 700
Anchorage, AK 99503
Phone: (907) 646-3400

Attorney for Defendant-Appellant

**TABLE OF CONTENTS**

I. INTRODUCTION ………………………………………………….… 1

II. ARGUMENT …………………………………………………………... 2

    A. *Rahimi* definitively rejects the Government's "virtuous citizen" theory that Second Amendment rights are reserved for "responsible, law-abiding" citizens. ………………………………….. 2

    B. There is no historical tradition of categorically disarming persons who are considered "dangerous," and *Rahimi* rejected this generalized standard for analogical comparison purposes. ……………….. 4

        1. Early English laws like the Statute of Northampton and colonial "going armed" laws are not relevantly similar to Section 922(g)(9), both in how and why the laws burden the Second Amendment right. ……………………………. 6

        2. 19th Century surety statutes are not comparable to 18 U.S.C. § 922(g)(9) ……………………………………………..… 8

    C. Section 922(g)(9) is overinclusive and unconstitutional as applied to Mr. Ryno. ……………………………………………….…... 9

III. CONCLUSION …………………………………………………....… 13

i

# TABLE OF AUTHORITIES

CASES

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
597 U.S. 1 (2022) …..................................................................…. *passim*

*United States v. Rahimi,*
602 U.S. ----, 144 S. Ct. 1889 (2024) ……………………………….…. *passim*

*United States v. Williams,*
--- F.4th ----, 2024 WL 3912894 (6th Cir. Aug. 23, 2024) …………...…….....… 4

*Worth v, Jacobson,*
108 F.4th 677 (8th Cir. July 16, 2024) ………...…………………….. 12, 13


STATUTES

18 U.S.C. § 922(g)(8) ……………………………………………………..... *passim*

18 U.S.C. § 922(g)(9) ……………………………………………………. *passim*

1836 Mass. Acts 750, ch. 134, § 16 …………………………………….… 8


HISTORICAL SOURCES

*Rex* v. *Sir John Knight*, 1 Comb. 38, 90 Eng. Rep. 330 (K. B. 1686) …………..… 7

*Statute of Northampton*, 2 Edw. 3, c. 3 (1328) (Eng.) …………………...…… 6

1 Wm. & Mary c. 2, 7 in 3 Eng. Stat. at Large 417 ………………………….… 7

## I. INTRODUCTION

The Government's burden is to show that Section 922(g)(9) is "relevantly similar" to a "well-established and representative historical analogue." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 30 (2022). The Government's Answer fails to identify any competent evidence that 18 U.S.C. § 922(g)(9) comports with this Nation's history of firearm regulation. The proffered historical examples differ significantly from Section 922(g)(9) in both how and why they burden the Second Amendment right. These examples are materially different in their means, justification, and scope compared to the law under review. Accordingly, the Government has failed to carry its burden.

The Supreme Court's recent decision *United States v. Rahimi*, 602 U.S. ----, 144 S. Ct. 1889 (2024), does not disturb this conclusion and in fact vindicates Mr. Ryno's Second Amendment challenge. There, the Court held that when a person is (1) subject to a protective order and (2) has been found by the issuing court to pose a credible threat to the physical safety of another, that individual may, consistent with the Second Amendment, be temporarily disarmed while the protective order is in effect. *Id*. at 1896. In arriving at this narrow holding, the Court rejected the Government's sweeping argument that the Second Amendment was limited to "responsible" citizens. 144 S. Ct. at 1903. The Court held that such a standard was

1

potentially limitless, vague and unsupported by precedent. *Id.* ("It is unclear what such a rule would entail. Nor does such a line derive from our case law.").

Unlike the statute at issue in *Rahimi*, application of Section 922(g)(9) is not conditioned on particularized findings that a given individual poses a credible threat of violence to others. Moreover, the statute imposes a lifetime prohibition on the Second Amendment right.

Section 922(g)(9) automatically disarms all persons convicted of misdemeanor crimes of domestic violence for life with no opportunity to regain those rights. These features are not consistent with any well-established, longstanding historical tradition of firearm regulation. Mr. Ryno's prior convictions were not recognized as crimes at the time of the Founding, nor would they have resulted in lifetime prohibitions on possession of firearms. Accordingly, the law violates the Second Amendment, both facially and as applied to Mr. Ryno.

## II.   ARGUMENT

### A. *Rahimi* definitively rejects the Government's "virtuous citizen" theory that Second Amendment rights are reserved for "responsible, law-abiding" citizens.

The defendant in *Rahimi* challenged the constitutionality of 18 U.S.C. § 922(g)(8)), which prohibits firearm possession by persons who are subject to certain domestic violence protective orders. Rahimi brought a facial challenge, arguing that the law was unconstitutional in all its applications. The Court found that the facts of

2

Rahimi's case were sufficient to establish the constitutionality of the statute as applied to him. 144 S. Ct. at 1894-97.

Even though the Court found that Section 922(g)(8) was constitutional as applied to Rahimi, the Court unanimously rejected the Government's assertion that the Second Amendment is inapplicable to persons whom legislatures have found are not law-abiding, responsible citizens. The Court found that the term "responsible" was a vague term of unclear scope and did not derive from its case law. *Id.* at 1903.

In its Answer, the Government relies on the broad principle that the Second Amendment is limited to protecting the rights of "law-abiding, responsible" citizens. Gov. Ans. Br. at 12-15. *Rahimi* repudiated this "virtuous citizen" theory of constitutional rights as incompatible with the Second Amendment's history and text. *See Rahimi*, 144 S.Ct. at 1897 ("the right secures for Americans a means of self-defense") *and id*. at 1903 ("we reject the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.'").

Notably, Justice Thomas, who authored *Bruen*, remarked that the government's argument that the Second Amendment is restricted only to the law-abiding and responsible "lacks any basis in our precedents and would eviscerate the Second Amendment altogether." *Id*. at 1944 (Thomas, J., dissenting). Although he dissented, this portion of Thomas's decision is consistent with the majority opinion.

3

As explained in Appellant's Opening Brief, the Government's formulation of the Second Amendment as limited to law-abiding persons is overbroad, ahistorical and unworkable in practice. *Rahimi* makes clear that *Bruen* and *Heller* do not stand for the proposition that "that *only* law-abiding citizens have Second Amendment rights." *United States v. Williams*, --- F.4th ----, 2024 WL 3912894, at *4 (6th Cir. Aug. 23, 2024) (emphasis in original). Mr. Ryno, as a member of the national community, is among "the people" who are entitled to the Second Amendment's protections.

**B. There is no historical tradition of categorically disarming persons who are considered "dangerous," and *Rahimi* rejected this generalized standard for analogical comparison.**

In *Rahimi*, the Court reiterated its holding in *Bruen* that the government must demonstrate that the modern regulation falls within our Nation's longstanding, well-established historical tradition of firearms regulation. 144 S. Ct. at 1898. Although the historical tradition may be defined by principles drawn from multiple regulations, those principles must be definite and narrow, so as to "'apply[] faithfully the balance struck by the founding generation to modern circumstances.'" *See id.* (quoting *Bruen*, 597 U.S. at 29-30).

In this case, the Government defends the constitutionality of Section 922(g)(9) by offering a variety of historical analogues that it claims demonstrate a longstanding historical tradition of categorically disarming persons who are deemed to be

4

"dangerous." Gov. Ans. Br. 12-15, 17-29. The Government made identical arguments in *Rahimi*, offering the same laundry list of historical analogues which it argued established the broad principle that legislatures may disarm persons who are considered "dangerous" or "irresponsible."[1]

The *Rahimi* Court rejected the government's attempt to define the relevant principle at such a high level of generality. Instead, the Court took a more targeted approach. It ignored most of the government's proposed historical analogues, and confined its analysis to two sets of founding-era laws "that specifically addressed firearms violence" and shared a tightly-defined "why and how" with § 922(g)(8). *Id.* at 1899, 1901. The first set of laws were surety statutes, under which a magistrate who found "probable ground to suspect future misbehavior" (including "misuse of firearms") could temporarily require the suspect to post a bond guaranteeing good behavior. *Id.* at 1899-1900. The second group of laws were "going armed" laws, which imposed forfeiture of arms or imprisonment as punishment for "going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Id.* at 1901 (cleaned up). Applying *Bruen*'s two-step methodology, the Court then

---

[1] *See* Brief for the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 5322645, at *13, 22, 26-28 (U.S. Aug. 14, 2023); Tr. of Oral Argument at 4-6, 8-9, *United States v. Rahimi*, No. 22-915 (U.S. Nov. 7, 2023), available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/22-915_986b.pdf.

5

compared the "why and how" of those regulations to § 922(g)(8) in specific terms that focused on the regulations' substance, not generalities about legislatively-defined groups of people.

For the reasons explained below, none of the historical examples cited by the Government, including those discussed in *Rahimi*, bear any meaningful degree of correspondence with the signature features of Section 922(g)(9).

> **1. Early English laws like the Statute of Northampton and colonial "going armed" laws are not relevantly similar to Section 922(g)(9), both in how and why the laws burden the Second Amendment right.**

The earliest example cited by the Government is the 1328 Statute of Northampton, which is generally understood to have made it an offense to go armed in a manner that would cause terror or fear among the public. 2 Edw. 3, c. 3 (1328) (Eng.).

As a general matter, the Statute of Northampton bears little probative value on the meaning of the Second Amendment. In *Bruen*, the Supreme Court found this medieval provision to have little bearing on the Second Amendment, which was ratified 450 years later. 597 U.S. at 41. Its relevance is further diminished because it was seldom enforced and by 1686 had become nearly obsolete through disuse. *Bruen*, 597 U.S. at 42 (citing *Rex* v. *Sir John Knight*, 1 Comb. 38, 38–39, 90 Eng. Rep. 330 (K. B. 1686)).

6

And as the Government concedes, the Statute of Northampton only regulated the *manner* in which firearms could be displayed in public, with violations punishable by confiscation of said weapons. Gov. Ans. Br. at 20. In contrast, persons subject to § 922(g)(9) are subject to lifetime dispossession of weapons, regardless of the manner in which the firearms are used, irrespective of the individual's intentions.

Although *Rahimi* discussed historical "going armed" laws derived from the Statute of Northampton, the Court did not recognize these laws as establishing an historical tradition of categorically disarming groups of "dangerous persons." The most that can be said is that these regulations suggest a tradition of temporarily disarming individuals who have demonstrated a proclivity for misusing firearms against others. 144 S. Ct. at 1901. The burdens imposed on the Second Amendment right by Section 922(g)(9) apply categorically and without consideration of whether any given individual poses a credible risk of injury to others.

The Government's reliance on the 1689 English Bill of Rights is also misplaced. The law initially guaranteed that "Protestants . . . may have Arms for their Defence suitable to their Conditions, and as allowed by Law," 1 Wm. & Mary c. 2, 7 in 3 Eng. Stat. at Large 417 (1689). But as *Bruen* notes, even Catholics were permitted to keep such necessary Weapons as shall be allowed . . . by Order of the Justices of the peace . . . for the Defence of his House or Person." 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688), cited in *Bruen,* 597 U.S. at 45.

7

Although the Government notes that persons actively engaged in rebellion or rioting could face confiscation of their weapons, Gov. Ans. Br. at 21, nowhere does the Government identify an historical precursor that imposed a lifetime ban on possession of firearms for all purposes, in all places, based on an individual's predicate criminal conviction. This lackluster record strongly reinforces the conclusion that § 922(g)(9) is unconstitutional.

### 2. 19th Century surety statutes are not comparable to 18 U.S.C. § 922(g)(9).

In the 19th Century, some states enacted surety statutes that required the posting of a bond before individuals could bear arms in public in a manner that would result in a breach of the peace. For example, an 1836 Massachusetts law provided that if a person was accused of going armed with a "dirk, dagger, sword or pistol or other offensive and dangerous weapon without reasonable cause to fear and assault or other injury, or violence to his person, or to his family or property," that person could be compelled to post a surety bond upon complaint of any person having reasonable cause to fear and injury, or breach of the peace. *See* 1836 Mass. Acts 750, ch. 134, § 16, cited in *Bruen*, 597 U.S. at 5.

As explained in Appellant's Opening Brief, any comparison between these laws and Section 922(g)(9) requires applying a higher level of generality than is tolerated under *Bruen*. *See Rahimi*, 144 S. Ct. 1926 (Barrett, J., concurring) ("a court

8

must be careful not to read a principle at such a high level of generality that it waters down the right.").

As the Court explained in *Rahimi*, surety laws imposed only temporary disarmament, and provided the accused with significant procedural protections. A surety bond could be ordered only after a judicial finding that the accused was reasonably likely to engage in misbehavior that posed injury to others. 144 S. Ct. at 1901-1902. Application of § 922(g)(9) is far less discriminating and does not require proof that the individual has a history of misusing weapons or poses a risk of violence to any person.

Moreover, failure to comply with the conditions of the surety bond did not result in forfeiture of weapons, merely the forfeiture of the surety bond. *Id.* And the posting of the bond could be waived where the individual could show a special need for self-defense. *Id.* In contrast, persons subject to Section 922(g)(9) are disqualified from possessing weapons for life, with no exceptions for self-defense, or possession of firearms in the home. These kinds of laws did not impose a "comparable burden" to Section 922(g)(9) that was "comparably justified." *Bruen*, 597 U.S. 3.

### C. Section 922(g)(9) is overinclusive and unconstitutional as applied to Mr. Ryno.

Relying primarily on unproven allegations derived from the Presentence Report, the Government argues that Section 922(g)(9) is constitutional as applied to

9

Mr. Ryno because his prior convictions show that he poses a risk of misusing firearms. Gov. Ans. Br. at 33-35. As a factual matter, the Government did not have to prove any of these allegations during its prosecution in this case, because Section 922(g)(9) does not require case-specific factual findings.

Mr. Ryno's prosecution was triggered by years-old misdemeanor convictions involving an intimate partner who separated from him five years ago. These prior convictions did not require proof of violent physical force; as explained in Appellant's Opening Brief, a misdemeanor assault in Alaska may be committed by reckless or negligent conduct, which falls short of the federal definition of violent physical force. *Borden v. United States,* 593 U.S. 420, 427 (2021) ("Recklessness and negligence are less culpable mental states because they instead involve insufficient concern with a risk of injury."). Mr. Ryno violated Section 922(g)(9) because he fell within a broad, legislative-defined categorization, one which will invariably include persons who pose little or no risk of harming others. Although *Rahimi* recognized that the Second Amendment may allow laws banning the possession of firearms by categories of persons thought by a legislature to present a "special danger of misuse," that does not mean those lines can be drawn so crudely. 144 S. Ct. at 1901-1902.

The elements of Section 922(g)(8), the statute under review in *Rahimi*, are far more demanding. The Supreme Court characterized Section 922(g)(8) as a "narrow"

10

prohibitory regime. 144 S. Ct. at 1902.

First, in order to trigger Section 922(g)(8), the protective order must be issued after a hearing in which the person subject to the order "received actual notice, and at which such person had an opportunity to participate." § 922(g)(8)(A). In addition, the protective order must "restrain[] that person from harassing, stalking, or threatening an intimate partner of such person or child, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child." 18 U.S.C. § 922(g)(8)(B).

Finally, the protective order must include either (1) a finding that the respondent either poses "a credible threat to the physical safety" of a protected person, 18 U.S.C. § 922(g)(9)(C)(i), or (2) contains a provision that "prohibits the use, attempted use, or threatened use of physical force," § 922(g)(8)(C)(ii). Notably, the Court declined to address whether this latter provision, which does not require a judicial finding of dangerousness, was compatible with the Second Amendment. *Id.* at 1898-99. Instead, the Court held that the Government had sustained its burden of showing that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others. *Id.* In this case, there are no findings supporting the conclusion that Mr. Ryno posed a credible threat to the physical safety of others.

The Government nonetheless offers a variety of statistics supposedly

11

demonstrating that persons who have committed misdemeanor domestic violence offenses have a greater propensity to injure others with firearms. Gov. Ans. Br. at 15-17. Yet even assuming that persons convicted of misdemeanor domestic violence offenses as a whole pose a greater risk of future violence, that still does not justify categorically disarming *all* persons with misdemeanor domestic violence convictions. *See Rahimi*, 144 S.Ct. at 1901 (noting that the statute at issue did "not broadly restrict arms use by the public generally"). As *Rahimi* makes clear, withholding or denying the right to bear arms based on generalized findings of "dangerousness" would eviscerate the Second Amendment.

In *Worth v, Jacobson*, the Eighth Circuit found that Minnesota's permit-to-carry statute, which required that applicants be at least 21 years old, violated the Second Amendment. 108 F.4th 677, 694 (8th Cir. 2024). The court reached this conclusion notwithstanding statistics showing that the murder arrest rate for 18- to 20-year-olds was 33 percent higher than the murder arrest rate for the next most homicidal age group, and that 18- to 20-year-olds were the "most likely" of any age group "to use firearms to commit homicides and other violent crimes." *Id.*

Citing *Rahimi*, the Eighth Circuit held that even accepting the statistical data, "it would be a stretch to say that an 18-year-old 'poses a clear threat of physical violence to another.' " 108 F.4th 677 at 694 (citing *Rahimi*, 144 S. Ct. at 1901). Allowing a legislature to disarm a category of people based on a belief of future

12

violence would subjugate the right to bear arms to "a second-class right, subject to an entirely body of rules than the other Bill of Rights guarantees." *Id.* (citing *Bruen*, 597 U.S. at 70).

Mr. Ryno was permanently stripped of his Second Amendment rights by a law that applies indiscriminately, regardless of an individual's actual risk of violence. As applied to Mr. Ryno's possession of a firearm outside the home for purposes of self-defense, the law is unconstitutional.

### III.  CONCLUSION

For the foregoing, the Court should vacate Mr. Ryno's conviction.

DATED this 20th day of September, 2024.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

*/s/ Daniel Poulson*
Assistant Federal Defender

*Attorney for Appellant*
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
188 W. Northern Lights Blvd., Suite 700
Anchorage, AK  99503
Phone:   907- 646-3400
Fax:       907-646-3480
E-Mail:  daniel_poulson@fd.org

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES,<br><br>    Petitioner-Appellee,<br><br>vs.<br><br>JOEL MICHAEL RYNO,<br><br>    Defendant-Appellant. | C.A. No. 23-3426<br><br>D.C. No. 3:23-cr-00045-JMK-MMS<br><br>**CERTIFICATE OF COMPLIANCE** |

The brief is proportionately spaced, using Times New Roman 14 point. The word count is 2,903.

DATED this 290th day of September, 2024.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

/s/ Daniel Poulson
Assistant Federal Defender

*Attorney for Appellant*
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
188 W. Northern Lights Blvd., Suite 700
Anchorage, AK  99503
Phone:   907- 646-3400
Fax:       907-646-3480
E-Mail:   daniel_poulson@fd.org

14